Teri D. WHEELER, Appellant,

v.

The STATE of Texas, Appellee.

Carol GUYNN, Appellant,

v.

The STATE of Texas, Appellee.

Charlie WHITE, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 59804–59806.

Court of Criminal Appeals of Texas,
Panel No. 2.

July 21, 1982.

On Rehearing Sept. 28, 1983.

Rehearing Denied Nov. 23, 1983.

Gerald H. Goldstein and Mark Stevens, San Antonio, Bruce L. Sternberg, David Allen Smith, Austin, for appellant.

Arthur C. Eads, Dist. Atty. and Weldon Ralph Petty, Jr., Asst. Dist. Atty., Belton, Robert Huttash, State's Atty., Austin, for the State.

Before DALLY, W.C. DAVIS and CLINTON, JJ.

OPINION

DALLY, Judge.

These are appeals from convictions for the possession of more than four ounces of marihuana. The cases were consolidated for trial; punishment in each case was assessed at imprisonment for four years.

The sole ground of error advanced by the appellants is that the trial court erred in overruling a motion to suppress the evi-

dence obtained under a search warrant; the appellants assert that the information showing probable cause to support the warrant was obtained by an unlawful warrantless search.

The search warrant was issued and executed on August 23, 1977, for the Wheeler property. These premises, located on a seventy-four acre tract of land in rural Lampasas County, included à greenhouse, a residence and a barn.

The affidavit supporting the warrant recited that the affiant, Deputy Sheriff Bob McClinton, had observed through a telescopic lens that there were marihuana plants growing in the greenhouse on the property.

To discuss the appellant's claim that this telescopic observation constituted an unlawful search, a brief discussion of the facts leading to the execution of the search warrant is necessary.

Lampasas County Deputy Sheriff Gordon Morris testified that he and other officers began surveillance of the Wheeler property in mid-July of 1977, prompted by information that no one was allowed to enter the fenced property without first telephoning, or being escorted from the gate, and that there was a large greenhouse within the fenced property which was surrounded by an additional fence.

Deputy Morris described the greenhouse as constructed "of clear plastic," and explained that in the sunlight he could see something green inside. He also testified that there was "a large louvered opening" on the west end of the greenhouse, approximately four feet square, and there was a fan inside the greenhouse on the other side of the louvered opening. The louvers of the opening were between four and six inches apart, and opened to permit ventilation of the greenhouse.

While on a public road about a mile away Deputy Morris looking with a pair of eight by fifty binoculars could see through the louvered opening in the greenhouse. He saw growing green plants but could not identify them. He returned various times

to observe the greenhouse through the binoculars, but could form no definite conclusion about the type of plants he saw. Thereafter, with the permission of Mr. Maurice Garner, Deputy Morris and other officers observed the greenhouse with binoculars from the Garner property about 100 yards west of the greenhouse. Deputy Morris tentatively identified the plants he could see in the greenhouse as marihuana. He returned after dark to the Garner property, accompanied by Lampasas police officer Tim Angermann and Deputy Sheriff McClinton. They observed the greenhouse through a night vision telescope, but with the telescope were unable to see into the greenhouse. On August 23, 1977, a few days later, at between four and five o'clock p.m. Deputies Morris and McClinton returned to the Garner land accompanied by city patrolman Gilbert White and Lampasas detective David Romack. Using a 600 millimeter telephoto lens, they were able to see through the louvered opening in the greenhouse, and to positively identify the plants as marihuana. Believing that their surveillance had been detected by a man who came around the corner of the greenhouse, Deputy McClinton returned to the Sheriff's Department, drafted an affidavit, and obtained a search warrant which was executed that night. Testimony concerning the marihuana found on the premises was admitted.

The greenhouse was approximately two hundred yards from the house, and was connected to the house by a well-traveled road. The photographs of the premises admitted into evidence show that fences around the greenhouse and the property were of wire. A chain-link gate to the property was posted with two signs: "Beware of dogs" and "If gate locked—honk twice or check back later at: 556–3997. Thank you, Mrs. Wheeler."

The appellants, relying on *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), contend that the telescopic observation of the greenhouse was an unconstitutional search. In *Katz* the Supreme Court made clear that "[t]he Fourth Amendment protects people, not places.

What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." Accord, *Turner v. State,* 499 S.W.2d 182 (Tex.Cr.App.1973); *Long v. State,* 532 S.W.2d 591 (Tex.Cr.App.1975). Rejecting the argument that a physical intrusion into a given enclosure is necessary to find a search, the Court held that the proper focus is whether the government's activities violated the privacy upon which the defendant justifiably relied.

In the recent case of *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), the United States Supreme Court reiterated that the proper focus in determining whether there has been a search under the Fourth Amendment is whether a "justifiable," "reasonable," or "legitimate expectation of privacy" has been invaded. This determination, the Court stated,

> "normally embraces two discrete questions. The first is whether the individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy,' ... whether ... the individual has shown that 'he seeks to preserve [something] as private ... The second question is whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as "reasonable,"' ... whether ... the individual's expectation, viewed objectively, is 'justifiable' under the circumstances."

The Court in *Smith* concluded that the installation and use of a pen register which recorded the telephone numbers that the defendant dialed on his home telephone did not constitute a search. The Court found that even if the defendant had some subjective expectation that the numbers he dialed would be private, he could not claim a "legitimate expectation of privacy" in the numbers because he had voluntarily conveyed the information to the telephone company. He assumed the risk that the information he had "exposed" would be revealed.

Appellants argue that under a *Katz* and *Smith* analysis they had a reasonable expectation of privacy in the contents of the greenhouse. They say that the opacity of the greenhouse, the double enclosure, the signs on the locked gate of the outer fence, all show appellants' subjective expectation that the contents of the greenhouse would remain private, and "objectively, it is equally clear that the actions of Appellants were recognized by the police as efforts to maintain privacy." The appellants contend that the use of the telephoto lens to observe the contents of the greenhouse was an unconstitutional invasion of this reasonable expectation of privacy.

We disagree. For reasons which will be stated, we conclude that the telescopic observation of the greenhouse was not a search under the Fourth Amendment.

In *Johnson v. State,* 469 S.W.2d 581 (Tex. Cr.App.1971), the police acting on an anonymous tip went to the defendant's apartment. They knocked on the door, and when no one answered, they looked into a window through a two inch gap between partially drawn draperies, and saw what appeared to be stolen merchandise. A search warrant was obtained on the basis of this observation. The Court rejected the contention that the window observation was a search, stating:

> "Under this set of facts, we cannot say that appellants could 'reasonably assume that they were free from uninvited inspection through the window' and we must hold that no search protected by the Fourth Amendment occurred."

469 S.W.2d at 584.

In *Turner v. State,* 499 S.W.2d 182 (Tex. Cr.App.1973), a police officer investigating a tip that marihuana was being used in the defendant's house looked through a window and saw the defendant and two other persons smoking a pipe filled with what appeared to be marihuana. The Court noted that there were apparently no blinds or curtains on the window, and that the officer had made his observation from the premises next door. Under the *Katz* rationale, the Court refused to find that a search had taken place, stating "[i]t is not a search to observe that which is open to view." The Court noted that:

"This court had previously stated [in *Gil v. State,* 394 S.W.2d 810 (Tex.Cr.App. 1965)] the rule is that when one is so foolish as to leave his windows unsecured he may not complain if another observes an illegal act being committed therein. See also *Giacona v. State,* 372 S.W.2d 328 (Tex.Cr.App.1963), cert. denied, 375 U.S. 843, 84 S.Ct. 92, 11 L.Ed.2d 70, and *Crowell v. State,* [147 Tex.Cr.R. 299, 180 S.W.2d 343 (Tex.Cr.App.1944)]"

499 S.W.2d at 184.

In *Long v. State,* 532 S.W.2d 591 (Tex.Cr. App.1975), a sheriff and deputy had gone to a house on rural property in Wise County to inquire about suspicious aircraft flights from the property. They knocked but received no response, so they continued around the house to return to the car. Through an open uncurtained window they felt a blast of heat, detected a strong marihuana odor, and saw a fan and heater and a substance covering the floor and stacked around the walls. The Court, quoting with approval from Turner, found that this observation did not constitute a search:

"[I]t is the duty of a policeman to investigate, and we cannot say that in striking a balance between the rights of the individual and the needs of law enforcement the Fourth Amendment itself draws the blinds the occupant could have drawn but did not."

532 S.W.2d at 595.

The appellants seek to distinguish these cases from the present case by pointing to the fact that in *Turner, Johnson,* and *Long* the observations through open windows were made without visual aids.

However, this distinction does not necessarily bring the visually aided observation in the present case within the ambit of a search under the Fourth Amendment. Several cases have declined to find that under the *Katz* analysis the use of visual aids to detect activities in private premises constitutes a search. In *Fullbright v. United States,* 392 F.2d 432 (10th Cir.), cert. denied, 393 U.S. 830, 89 S.Ct. 97, 21 L.Ed.2d 101 (1968), police concealed themselves on the defendant's farm, and, with binoculars, observed through the open door of a shed the defendant and two others operating a still inside the shed and they saw the defendant load bottles of distilled spirits from the shed into an automobile. They followed the automobile and arrested its occupants after a search of the vehicle revealed several bottles of illegal distilled spirits. The Court noted that the police made their observations from a location outside the curtilage. While being careful to state that "we do not mean to say that surveillance from outside a curtilage under no circumstances could constitute an illegal search in view of the teachings of *Katz v. United States* [citation omitted]," the Court found that under the facts of the case before it the defendant had failed to carry his burden of showing the visually aided observation was an intrusion on a protected area or person.

In *Commonwealth v. Hernley,* 216 Pa.Super. 177, 263 A.2d 904, 48 A.L.R.3d 1172, cert. denied 401 U.S. 914, 91 S.Ct. 886, 27 L.Ed.2d 813 (1971), an FBI agent keeping surveillance on defendant's printshop noticed one evening that the printshop presses were being operated. The windows were so high he could not see what was being printed from his position on the ground, so he mounted a four-foot ladder placed on railroad tracks abutting the property. From this position thirty to thirty-five feet distant he looked through binoculars into a side window of the shop and could see football gambling forms being run off the presses. The defendants argued that this was an unlawful search into an area in which they had a reasonable expectation of freedom from governmental observation. The Court rejected this argument, holding,

"Our case presents the situation in which it was incumbent on the suspect to preserve his privacy from visual observation. To do that the appellees had only to curtain the windows. Absent such obvious action we cannot find that their expectation of privacy was justifiable or reasonable. The law will not shield criminal activity from visual observation when the actor shows such little regard for his privacy."

In *State v. Manly,* 85 Wash.2d 120, 530 P.2d 306, cert. denied sub. nom. *McIntire v. Washington,* 423 U.S. 855, 96 S.Ct. 104, 46 L.Ed.2d 81 (1975), the court declined to find that an unlawful search had occurred when a policeman, informed that plants resembling marihuana were growing in the second floor window of the defendant's apartment, had used binoculars to view the plants from his car across the street and from the public sidewalk below. The Court noting that the United States Supreme Court had, at least inferentially, approved the use of binoculars, in *On Lee v. United States,* 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952); *United States v. Lee,* 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927); followed the reasoning in *Hernley* and *Fullbright* in concluding that no search had taken place.

The court in *Commonwealth v. Williams,* 262 Pa.Super. 508, 396 A.2d 1286 (1979) found that police observation from the third floor of a building into defendant's third floor uncurtained windows, both with binoculars and with a startron—a device enabling the observer to see into dark areas—, was not an unlawful search, stating:

"Considering all the factors advanced by appellant,—The location of the apartment, the duration of the surveillance, the use of binoculars and of the startron—it remains irrefutably clear that just as in *Hernley,* the occupants in the apartment could have precluded all observation by the single expedient of curtaining or otherwise covering the windows. Applying the standard of a balancing of interests between the security of public order by detection and prevention of crime and a person's immunity from police interference in his privacy, we find that the surveillance in the case did not violate the appellant's fourth amendment rights."

Other courts have also concluded under analogous circumstances that visually aided observations did not invade reasonable expectations of privacy. See *United States v. Allen,* 633 F.2d 1282 (9th Cir.1980) (helicopter and binocular surveillance of activities on defendant's ranch); *United States v.*

*Grimes,* 426 F.2d 706 (5th Cir.1970) (observation through binoculars of defendant placing untaxed whiskey in automobile); *United States v. Minton,* 488 F.2d 37 (4th Cir.1973), cert. denied 416 U.S. 936, 94 S.Ct. 1936, 40 L.Ed.2d 287 (observation from embankment through binoculars of activities in and around warehouse); *People v. Hicks,* 49 Ill.App.3d 421, 7 Ill.Dec. 279, 364 N.E.2d 440 (1977) (use of night binoculars to look through uncurtained hotel room window at 1:00 a.m.); *State v. Thompson,* 196 Neb. 55, 241 N.W.2d 511 (1976) (night observation with binoculars from alley into undraped house windows.)

The appellants cite *United States v. Taborda,* 635 F.2d 131 (2d Cir.1980); *United States v. Kim,* 415 F.Supp. 1252 (D.Haw. 1976); *People v. Arno,* 90 Cal.App.3d 505, 153 Cal.Rptr. 624 (1979) to support their contention. In *Taborda* the court held that unenhanced observations of objects and activities inside a home do not impair a legitimate expectation of privacy, but that "any enhanced viewing of the interior of a home does impair a legitimate expectation of privacy." The failure to preclude observation by curtaining the window does not rebut this expectation, under the court's analysis. Accordingly, the court found that telescopic observation by police of the inside of the defendant's apartment through an uncurtained window from an apartment across the street was an unlawful search.

Similarly, the court in *United States v. Kim,* supra, rejecting the reasoning of *Hernley* and *Fullbright,* held that FBI agents' telescopic surveillance of defendant's gambling activities inside his apartment invaded an area in which the defendant had a reasonable expectation of privacy. The court, distinguishing visually aided surveillance of "non-private" places, and unaided surveillances of activities within homes, found the visually aided surveillance of a home to be a search. The court refused to conclude that the defendant, by leaving his curtains open, forfeited his reasonable expectation of privacy.

In *People v. Arno,* supra, the police used binoculars to look from a hilltop into the eighth floor window of a business suite being used as a distribution center for pornographic films. The court, relying on *Kim,* found an invasion of the defendant's reasonable expectation of privacy. The majority found that an individual has a reasonable expectation of privacy to that which cannot be seen by the naked eye nor heard by the unaided ear.

We are not persuaded by the reasoning of these cases. Applying the standards set out in *Katz* and further explained in *Smith v. Maryland,* supra, we conclude that the appellants have not shown a legitimate expectation that the contents of the greenhouse would remain private. The appellants say that their subjective expectation of privacy is shown by the double enclosure of the greenhouse and the fact that it is opaque. We note that the wire fences surrounding the pr. perty and the greenhouse may have shown the appellants' intentions to prevent physical intrusion into the property, but the fences offered no impediment to visual observation. Compare *United States v. Williams,* 581 F.2d 451 (5th Cir.1978), cert. denied 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979). Similarly the United States Supreme Court noted in *Katz* that the defendant by closing the door of the partially glass-walled telephone booth had shown that he intended to exclude the uninvited ear but not the intruding eye.

However, even if the appellants did have a subjective expectation that the contents of the greenhouse would remain private, we find that under the facts of this case such expectation is not "one that society is prepared to recognize as 'reasonable.'" Since the appellants did not curtain or otherwise obscure the view into the greenhouse afforded by the four foot square louvered opening, they forfeited their expectation of privacy and could not justifiably assume that the interior of the greenhouse would remain free from observation. See *Long v. State,* supra; *Turner v. State,* supra; *Johnson v. State,* supra. See also *Smith v.*

*Maryland,* supra. The police made their observations from a place in which they were lawfully entitled to be. Cf. *Phelan v. Superior Court,* 90 Cal.App.3d 1005, 153 Cal. Rptr. 738 (1979). The visual aids which the police used in their surveillance of the greenhouse did not change the character of their lawful observation to a search under the Fourth Amendment. See *Fullbright v. United States,* supra; *Commonwealth v. Hernley,* supra; *United States v. Allen,* supra. See also *United States v. Lee,* supra; *On Lee v. United States,* supra.

The protections of the Fourth Amendment do not restrict the police to the use of their unaided senses and physical abilities. See *United States v. Allen,* supra; *United States v. Dubrofsky,* 581 F.2d 208, 211 (9th Cir.1978). Devices which enhance the senses, such as the binoculars, night vision telescope and telephoto lens used in the present case, and techniques such as aircraft surveillance, also used in this case, may increase police effectiveness and contribute to surveillance without violation of the Fourth Amendment.

The judgments are affirmed.

CLINTON, Judge, dissenting.

The Fourth Amendment claim discerned by the Supreme Court in *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) was that Smith "had a 'legitimate expectation of privacy' regarding *the numbers he dialed on his phone,*" *id.,* U.S. at 741, 99 S.Ct. at 2581. The nub of the matter was found in this:

"*When he used his phone,* petitioner voluntarily conveyed numerical information to the telephone company and "exposed" that information to its equipment in the ordinary course of business. *In so doing,* petitioner assumed the risk that the *company would reveal* to police the numbers he dials."[1]

*Id.,* at 744, 99 S.Ct. at 2582. Accordingly, it was concluded that "petitioner in all probability entertained no actual expectation of privacy in the phone numbers he dialed, and

1. All emphasis is mine unless otherwise indicated. cated.

that, even if he did, his expectation was not 'legitimate,'" *id.,* at 745, 99 S.Ct. at 2583.

In the case at bar the appellants affirmatively displayed such trappings of security, which objectively indicated expectations of privacy, that his observations of them evoked the curiosity of Deputy Sheriff Gordon Morris to the extent that he or other peace officers unsuccessfully tried binoculars from one mile away, a night vision telescope, helicopters and aerial photography to intrude on the privacy of citizens and their premises. Finally, when all else failed, they acquired a 600 mm telephoto lens, and began to advance on the greenhouse. Deputy Morris conceded:

> "Q: So each time you moved physically closer to the greenhouse, and each time you increased your magnification, you were trying to shorten the distance so you could actually put yourself into that greenhouse?
>
> A: Right."

Only then did Deputy Morris obtain what he professed to believe was probable cause.

This situation may not be equated with installation of a pen register in offices of a telephone company to record numbers that one dials on a telephone, and to do so is to approve determined and calculated invasions of privacy.

In finding that, even if Smith habored some objective expectation that the phone numbers he dialed would remain private, his expectation was not "one that society is prepared to recognize as 'reasonable,'" the Supreme Court invoked the proposition "that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties," and for an example pointed to its explanation in *United States v. Miller,* 425 U.S. 435, 442–444, 96 S.Ct. 1619, 1623–24, 48 L.Ed.2d 300 (1976):

> "The depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government... This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third person and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed."

The *Miller* rationale applied by the Supreme Court to *Smith v. Maryland,* supra, is inapposite to the facts in the case at bar. The majority quotes selectively only a portion of the *Katz* dictum that "[t]he Fourth Amendment protects people not places." The Supreme Court added, "But what he *seeks* to preserve as private, *even in an area accessible to the public,* may be constitutionally protected." *Id.,* 389 U.S. at 351–352, 88 S.Ct. at 511. We must remember that while Katz stood in a public booth his expectation of privacy in carrying on a telephonic conversation prevailed against a "search and seizure" by electronic eavesdropping by his Government, *Katz,* 389 U.S. at 353, 88 S.Ct. at 512. Granted that his words were seized, still the *reasonableness* of his expectation of privacy flowed from "the vital role that the public telephone has come to play in private communication," *id.,* at 352, 88 S.Ct. at 512. The point, according to Justice Harlan, is that a public telephone booth is "a temporarily private place whose momentary occupants' expectations of freedom from intrusions are recognized as reasonable," *id.,* at 361, 88 S.Ct. at 516 (Harlan, J., concurring).[2]

So, the question of whether a subjective expectation of privacy so clearly held by appellants is "legitimate" depends upon what society is prepared to recognize as "reasonable." The answer to that question must depend, in turn, on what judges know as persons, for proving whatever "society is prepared to recognize"—much more that it

---

**2.** On overruling *Goldman v. United States,* 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942) (evidence obtaining by detectaphone admissible), Justice Harlan wryly noted: "Its limitation on Fourth Amendment protection is, in the present day, bad physics as well as bad law, for reasonable expectations of privacy may be defeated by electronic as well as physical invasion." *Id.,* at 362, 88 S.Ct. at 517.

is "reasonable"—is, in these times, a most difficult undertaking.

Nevertheless, considering the purpose and function of a modern greenhouse—rarely constructed of glass anymore [3]—I am satisfied that society, certainly rural society, is prepared to recognize as "reasonable" a demonstratively objective expectation of privacy in the interior of such a greenhouse.

When notions of custom and civility no longer served to protect enclosed land against depredation, rural communities prevailed on the Legislature to enact penal sanctions for certain specific offensive conduct.[4] The felt need for still further protection produced a criminal law against physical trespass generally, Article 1377c, P.C. 1925, as amended, and it spawned the posting of written notices forbidding non-consensual intrusion all over the countryside. Now, "fencing or other enclosures obviously designed to exclude intruders ..." gives notice that one must not enter property or a building without effective consent. V.T.C.A. Penal Code, § 30.05.[5] Thus, code of values commonly held by society with respect to privacy is reflected in the legislation its duly elected representatives have adopted.

A privacy fence around an isolated greenhouse is unreasonably redundant. The fortuitous circumstance that a set of slatlike louvers opened when the fan went on to ventilate the large Quonset style greenhouse, and remained open long enough for magnified eyes to detect what the mind hoped were marihuana plants, would not, in my view at least, cause society to withhold its recognition that the expectation of privacy exhibited by appellants was reasonable. In the country, privacy is violated by invitation only.[6]

However, the more use of such exotic, sophisticated devices and techniques is condoned, the more will society become conditioned to take as reasonable that which an earlier generation rejected. When the invasion approved today is extended in the next case and then the next, all reasonable expectations are doomed if the peace officer can but find the technology that enables him stealthily to intrude.

I dissent.

Before McCORMICK and W.C. DAVIS, JJ.

## OPINION ON APPELLANTS' MOTION FOR REHEARING

McCORMICK, Judge.

On original submission, a panel of this Court affirmed appellants' convictions for the possession of more than four ounces of marihuana. The cases were consolidated for trial; punishment in each case was assessed at imprisonment for four years.

The sole ground of error advanced by appellants is that the trial court erred in overruling a motion to suppress the evidence, seized under authority of a search warrant acquired on the basis of an affidavit containing information gathered by an unlawful warrantless search. Appellants contend that various police officers, over a month long period, from diverse vantage points in the air and on the ground, surveilled appellants' opaque greenhouse with

---

**3.** Traditionally a greenhouse is a building with glass components wherein plants, flowers, and sometimes vegetables are raised for purposes of sale; a conservatory, on the other hand, is a small glass structure near a private residence for raising plants and flowers for the personal pleasure of the resident. 101 C.J.S. 918, Zoning § 157; Webster's New Collegiate Dictionary. For years in this State the Commissioner of Agriculture has been charged with the responsibility of inspecting commercial greenhouses to determine whether they are infected with injurious diseases or insect pests, see former Article 119, V.A.C.S., and he still is by V.T.C.A. Agriculture Code, § 71.044.

**4.** See, e.g., former Article 1377b, P.C. 1925, as amended, which proscribed entering enclosed lands without consent of the owner to hunt, fish or camp.

**5.** " 'Building' means any enclosed structure intended for use or occupation ... for some purpose of trade, manufacture, ornament, or use." V.T.C.A. Penal Code, § 30.01(2).

**6.** Deputy Morris did not conduct surveillance from adjoining property until he had sought and obtained permission from the owner.

telescopes and lenses of increasing magnitude before finally observing marihuana plants. The ultimate observation was made through a five-inch opening in the exhaust fan louvres of the greenhouse.

The majority opinion of the panel concluded that no "search" under the Fourth Amendment occurred through telescopic observation of the greenhouse and that no legitimate expectation of privacy had been invaded because appellants did not manifest a "reasonable" expectation that the contents of the greenhouse would remain private, citing *Long v. State,* 532 S.W.2d 591 (Tex.Cr.App.1975); *Turner v. State,* 499 S.W.2d 182 (Tex.Cr.App.1973); and *Johnson v. State,* 469 S.W.2d 581 (Tex.Cr.App.1971). Much of the Court's analysis was devoted to the fact that the technological "visual aids" employed by the police in their surveillance of the greenhouse did not change the otherwise lawful character of their observation to a search under the Fourth Amendment, citing *Fullbright v. United States,* 392 F.2d 432 (10th Cir.1968), cert. denied 393 U.S. 830, 89 S.Ct. 97, 21 L.Ed.2d 101 (1968); *Commonwealth v. Hernley,* 216 Pa.Super. 177, 263 A.2d 904, 48 A.L.R.3d 1172, cert. denied 401 U.S. 914, 91 S.Ct. 886, 27 L.Ed.2d 813 (1971), and *United States v. Allen,* 633 F.2d 1282 (9th Cir.1980).

While we agree with the panel opinion's reasoning that police use of binoculars and other visual aids is generally acceptable, the true focus of the question presented by this case is not whether police use of technological sensory enhancements is per se a search under the Fourth Amendment. There may or may not be a "search", but the answer does not depend on the type of device. Rather, the answer depends on the purpose and employment of the device under the facts presented; i.e., whether it invades a "legitimate expectation of privacy." See *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979); *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

This approach to the problem was reinforced as recently as *United States v. Knotts,* — U.S. —, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), wherein Mr. Justice Rehnquist employed the *Smith/Katz* analysis of the facts to determine whether police monitoring of a beeper was a "search"; despite generally opining that "[n]othing in the Fourth Amendment prohibited the police from augmenting the sensory facilities bestowed upon them at birth with such enhancement as science and technology afforded them in this case." The concurring opinion of Justices Stevens, Brennan and Marshall disavows the augmentation comment as dicta, finding that the Court "held to the contrary in *Katz....*" "[A]lthough augmentation in this case was unobjectionable, it by no means follows that the use of electronic detection techniques does not implicate especially sensitive concerns." — U.S. at —, 103 S.Ct. at 1089. Clearly, the impact of technology on Fourth Amendment concerns is by no means a settled question. On that basis, we renew the analysis.

The Supreme Court of the United States has stated that whether a legitimate expectation of privacy has been invaded

"... normally embraces two discreet questions. The first is whether the individual, by his conduct, has exhibited an actual (subjective) expectation of privacy, '... whether ... the individual has shown that' he seeks to preserve (something) as private ... the second question is whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as "reasonable"' ... whether ... the individual's expectation, viewed objectively, is 'justifiable' under the circumstances." *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979).

This is essentially a restatement of Justice Harlan's concurring opinion in *Katz v. United States,* supra, explaining how "the Fourth Amendment protects people, not places": "[G]enerally, as here, the answer to that question requires reference to a 'place.'" Id. at 389 U.S. 361, 88 S.Ct. 516. Under the *Katz* expectation of privacy test, particular attention must be given to the nature of the place at which the observed

objects or activities are located, for this will bear directly upon whether there was a justified expectation of privacy as to those objects or activities. 1 LaFave, Search & Seizure, Section 2.2 (1978), at pages 257–58. Moreover, in *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978), the Court noted that the "capacity to claim the protection of the Fourth Amendment depends … upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place."

■ This record contains ample evidence that appellants sought to preserve the greenhouse, and its contents, as private. They located their greenhouse on brushy, rural property in Lampasas County, one mile from the nearest public road, and at least 100 yards from the nearest vantage point on the neighboring property. The greenhouse itself was opaque, with ventilation provided for by a four-foot exhaust fan covered with slat-like louvres. There was a fence around the greenhouse and another fence around the entire tract of land. The outer fence was locked and posted with signs. These are numerous manifestations of an "actual (subjective) expectation of privacy." *Smith v. Maryland,* supra.

As to the second prong of *Smith* and *Katz* analysis, the State maintains that appellants lost their subjective expectation of privacy by exposing "activities and things thereon to public view," relying on the assertion in *Katz* that

"[W]hat a person knowingly exposes to the public even in his home or office, is not a subject of Fourth Amendment protection." *Katz,* at 389 U.S. 347, 351, 88 S.Ct. 507, 514, 19 L.Ed.2d 576.

On the facts of this case, such reliance is misplaced. In fact, it was appellants' very well manifest expectation of privacy which raised suspicion to begin with. The only thing that was in "plain sight" of the officer's initial observation, aided by a telescope, was an opaque greenhouse with "green growing plants." Later, an officer with a night vision telescope, and still later aerial surveillance, observed nothing in plain sight, or out of the ordinary. Despite this, the investigation continued specifically *to observe the contents* of the greenhouse until the affiant, armed with a 600 millimeter lens, caught a glimpse through the fan louvres of what he observed to be growing marihuana plants.

Here, the technology employed, its purpose, together with the concerted effort to view what had tenaciously been protected as private, constitutes a search. As we stated in *Long:*

"A search means, of necessity, a quest for, a looking for, or a seeking out of that which offends the law. This implies a prying into hidden places for that which is concealed. It is simply not a search to observe that which is open to view." 532 S.W.2d at 593.

The crucial difference between the instant case and *Long, Turner,* and *Johnson* is the manifestation of privacy exhibited by appellants, and the efforts undertaken to overcome that privacy. This is simply not a case of open curtains inviting observation, or of an initial aided or unaided investigatory observation. See *Fullbright v. United States,* supra, ("we do not mean to say that surveillance … under no circumstances could constitute an illegal search in view of the teachings of *Katz*. …"); *United States v. Bifield,* 498 F.Supp. 497 (D.Conn.1980, aff'd 659 F.2d 1063 (2d Cir.1980), cert. denied 454 U.S. 821, 102 S.Ct. 105, 70 L.Ed.2d 93 (holding that it is no search to use binoculars to see display of weapons in lighted office of gas station located on major thoroughfare in commercial district). The protracted focus on delving into the contents of the greenhouse belies such a claim and is easily distinguishable from mere surveillance.

■ Clearly, what a person knowingly exposes to public view is not protected by the Fourth Amendment, *Katz v. United States,* supra. However, the Constitution does not require that one erect a stone bastion, or retreat to the cellar to exhibit a reasonable expectation of privacy. *State v. Carter,* 54 Or.App. 852, 636 P.2d 460, 461 (1981). See *Dow Chemical Company v.*

*United States,* 536 F.Supp. 1355, 1365 (E.D. Mich.1982); *State v. Ward,* 62 Haw. 509, 617 P.2d 568, 573 (1980) (constitution does not require person to shut himself off from "fresh air, sunlight and scenery"); Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn.L.Rev. 349, 402 (1974).

Under the facts presented by this record, the trial courts erred in overruling appellants' motion to suppress. The motion for rehearing is granted and the judgments herein are reversed and remanded.

W.C. DAVIS, J., dissents.