### 39491. LoGIUDICE v. THE STATE.

PER CURIAM.
After plenary consideration of this matter, it is found not to satisfy the criteria for the grant of certiorari and the writ is therefore vacated.
*All the Justices concur, except Smith, J., who dissents.*

DECIDED NOVEMBER 16, 1983 —
REHEARING DENIED DECEMBER 15, 1983.

*Horn & Maloy, Bruce Maloy,* for appellant.
*Johnnie L. Caldwell, Jr., District Attorney,* for appellee.

SMITH, Justice, dissenting.
I dissent from the court's dismissal of the grant of certiorari in this case. We granted certiorari to consider an important Fourth Amendment question: Whether the decision in Katz v. United States, 389 U. S. 347 (88 SC 507, 19 LE2d 576) (1967), modified the "open fields" doctrine first announced in Hester v. United States, 265 U. S. 57 (44 SC 445, 68 LE 898) (1924), to require a warrant for the search of a secluded field when a reasonable expectation of privacy can be shown to exist in that field. I believe that it did and, accordingly, would reverse.

Appellant Thomas LoGiudice was charged with possession of marijuana with intent to distribute in violation of OCGA § 16-13-30 (Code Ann. § 79A-811). Prior to trial, he filed a motion to suppress which was denied, following a hearing, by the trial court. Appellant was convicted after a bench trial. On appeal, the Court of Appeals affirmed. *LoGiudice v. State,* 164 Ga. App. 709 (297 SE2d 499) (1982).

In 1979 appellant purchased a 345-acre tract of land bordering on Georgia Highway 74 in Upson County, eight miles east of Thomaston. In the summer of 1980, Upson County Sheriff Merrill Greathouse began receiving reports of activity on appellant's land. Bully McDaniel, owner of a package store located on Highway 74 near the property, told the sheriff he had heard heavy earth-moving equipment operating late at night on the land. An unidentified source reported that in the fall of 1980 appellant hired a local contractor to

dig a well on the land, directed him to lay water pipe from the well some 300 yards through heavy woods, and then discharged him, explaining that he would complete the job himself.

Based on this information Sheriff Greathouse[1] entered appellant's land sometime in the fall of 1980 to search for illegal marijuana plants. At the hearing on appellant's motion to suppress, the sheriff admitted climbing both barbed wire and welded fences when entering appellant's property on this occasion. He searched the area surrounding appellant's trailer but found no marijuana. Later that fall, Sheriff Greathouse conducted an aerial search of appellant's land. He was again unable to detect any illegal activity, but noticed that appellant was constructing a new fence around his land.

On July 6, 1981, acting on a tip from an unidentified source, the sheriff and several Georgia Bureau of Investigation agents again entered appellant's land without a warrant to search for marijuana. According to Sheriff Greathouse, the group entered by a back route by crossing a creek, climbing a barbed wire fence, and following an old logging road some 200 yards until they reached a clearing. There they discovered a half-acre field of marijuana. The plants were surrounded by dense chicken-wire fencing material and were visible only from a distance of ten feet or less. A 35-foot path led from the field through dense undergrowth to a travel trailer owned by appellant and occupied by Tammy Harms. The officers conducted a "stake-out" of the field, remaining there for four and one-half to six hours. While there they observed Ms. Harms come onto the field and "fondle" the marijuana plants. No arrests were made at this time. The officers returned to the field on the morning of July 7, 1981 and observed appellant, Ms. Harms and Stephen Karlovich on the field. A search warrant was obtained,[2] and appellant, Harms and Karlovich were arrested.[3]

Evidence introduced at the suppression hearing showed that the

---

[1] Clearly Sheriff Greathouse is a "law enforcement officer" to whom the Fourth Amendment applies. See *State v. Young,* 234 Ga. 488, 494 (216 SE2d 586) (1975) (Fourth Amendment exclusionary rule applies to "action taken by law enforcement personnel"); OCGA § 15-16-1 (a) (Code Ann. § 24-2801) ("the sheriff is the basic law enforcement officer of the several counties of this state . . .").

[2] If Sheriff Greathouse had the right to be on the land in the first place, he needed no search or arrest warrant. Anyone violating the law in his presence would be subject to arrest and search under the "plain view" doctrine.

[3] Harms and Karlovich were tried separately from appellant. See *Karlovich v. State,* 165 Ga. App. 761 (302 SE2d 396) (1983).

front entrance to LoGiudice's land was guarded by two locked, welded iron gates and posted with "no trespassing" signs; that the marijuana field was not visible from adjoining property or any public road, and was located 300 feet from appellant's nearest boundary line; that Sheriff Greathouse, while disclaiming prior knowledge of any "no trespassing" signs, was fully aware that he had climbed a fence or fences and entered appellant's land without his permission.[4]

The Court of Appeals, citing *Giddens v. State,* 156 Ga. App. 258 (274 SE2d 595) (1980), affirmed the trial court's denial of appellant's motion to suppress. In so doing, the court relied on the "open fields" doctrine of Hester v. United States, supra. In Hester, federal revenue agents with prior information that Hester was trafficking in illegal moonshine whiskey hid near Hester's residence and observed him come out of the house and hand one Henderson a bottle of moonshine. The agents sounded an alarm. Hester grabbed a gallon jug from a nearby automobile, and he and Henderson fled on foot across a field, with the officers in pursuit. In their haste to escape the two suspects dropped the containers, which broke and were later determined to have contained illegal moonshine. On appeal of the trial court's refusal to suppress the agents' testimony concerning what had transpired in the field, the Supreme Court rejected Hester's Fourth Amendment claim. In a short opinion, Justice Holmes wrote for a unanimous Court that "the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers and effects,' is not extended to the open fields. The distinction between the latter and the house is as old as the common law."[5]

In the sixty years since the decision in Hester, courts have, based on the above language, fashioned an exception to the Fourth Amendment's warrant requirement known as the "open fields" doctrine. Simply stated, that doctrine holds that the Constitution's protection of "persons, houses, papers, and effects" does not extend to activities conducted in any area beyond the curtilage of a home.

---

[4] Apart from its Fourth Amendment implications, this conduct clearly violated the criminal trespass statute, see OCGA § 16-7-21 (Code Ann. § 26-1503), and constituted a common-law trespass, see OCGA § 51-9-1 (Code Ann. § 105-1401).

[5] This oft-quoted remark is misleading, and it reflects the dearth of analysis in the Hester opinion. There was, of course, no Fourth Amendment at the common law. In fact, the oppressive treatment persons received in England and in the colonies prior to the Revolution was a leading reason the founding fathers adopted the Bill of Rights. See Boyd v. United States, 116 U. S. 616, 623 (6 SC 524, 29 LE 746) (1886); Note: How Open Are The Open Fields?, 14 U. Tol. L. Rev. 133 (1982).

See United States v. Oliver, 686 F2d 356, 363 (6th Cir. 1982) (Keith, J., dissenting). The Court of Appeals has consistently applied a per se rule upholding warrantless searches which were conducted in areas outside a dwelling place or its curtilage. See, e.g., *Olson v. State,* 166 Ga. App. 104 (303 SE2d 309) (1983); *Giddens v. State,* supra; *Quarles v. State,* 142 Ga. App. 394 (236 SE2d 139) (1977); *Patterson v. State,* 133 Ga. App. 742 (212 SE2d 858) (1975).

Based on these authorities, the state argues that a warrantless search of land beyond the curtilage can never violate the Fourth Amendment. This position — which amounts to an assertion that the "open fields" doctrine may be used as carte blanche for warrantless searches of areas outside the curtilage — is simply untenable. Close analysis of the Hester decision and subsequent developments in Fourth Amendment law demonstrate that the "open fields" doctrine does not apply to this case.

Hester was decided in 1924, prior to application of the Fourth Amendment to the states, Mapp v. Ohio, 367 U. S. 643 (81 SC 1684, 6 LE2d 1081) (1961), and before the advent of modern Fourth Amendment theory as exemplified by Katz v. United States, 389 U. S., supra. The Hester decision also predated the development of the "exigent circumstances" doctrine, see McDonald v. United States, 335 U. S. 451 (69 SC 191, 93 LE 153) (1948), the "hot pursuit" doctrine, see Warden v. Hayden, 387 U. S. 294 (87 SC 1642, 18 LE2d 782) (1967), and the "plain view" doctrine, see Coolidge v. New Hampshire, 403 U. S. 443 (91 SC 2022, 29 LE2d 564) (1971). Were Hester not on the books and if the same factual situation arose today, no court would need to create a special "open fields" exception to the Fourth Amendment. Today the case would turn on the doctrine of hot pursuit. Hester and his accomplice committed a crime in plain view of police who were legally in place. Based on the hot pursuit and exigent circumstances doctrines, the police could lawfully pursue and arrest the defendants. Any expectation of privacy possessed by Hester had evaporated, since police had probable cause to follow and arrest, either in the open fields or the house, as a crime was committed in plain view and the officers were located in a place they had a legal right to be. See United States v. Santana, 427 U. S. 38 (96 SC 2406, 49 LE2d 300) (1976); Warden v. Hayden, supra. Moreover, the oft-quoted "open fields" language of Hester was unnecessary to the Court's decision in that case. Central to the Court's analysis was its observation that the moonshine containers had been abandoned by the defendants prior to their inspection by revenue agents, so that the defendants could not complain of a search of the abandoned property. "The defendant's own acts, and those of his associates, disclosed the jug, the jar and the bottle — and there was no seizure in

the sense of the law when the officers examined the contents of each after it had been abandoned." 265 U. S. at 58. For these reasons, it is unwise to rely on the outdated Hester decision in support of a sweeping "open fields" exception to the Fourth Amendment.[6]

Cases decided since Hester v. United States provide support for this position. In Katz v. United States, 389 U. S., supra, the Court retreated from the "constitutionally protected area" analysis of Fourth Amendment issues epitomized by the Hester case and Olmstead v. United States, 277 U. S. 438 (48 SC 564, 72 LE 944) (1928). Instead the Court focused on the individual's reasonable expectation of privacy in a given situation. As the opinion in Katz states: "[T]he correct solution of Fourth Amendment problems is not necessarily promoted by incantation of the phrase 'constitutionally protected area.' . . . For the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. [Cits.] But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." 389 U. S. at 350. In his concurrence in Katz, Justice Harlan formulated a test which has become the accepted standard for determining the applicability of the Fourth Amendment to a particular situation: "[T]here is a twofold requirement, first, that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.' " 389 U. S. at 361 (Harlan, J., concurring). The court has applied Harlan's test in subsequent decisions. See, e.g., Rakas v. Illinois, 439 U. S. 128 (99 SC 421, 58 LE2d 387) (1978).

Thus in Katz the Supreme Court for the first time recognized that the Fourth Amendment's protection of *"persons,* houses, papers, and effects, against unreasonable searches and seizures . . ." applies first and foremost to persons, not places. (Emphasis supplied.) Since Katz, the Supreme Court has time and time again reaffirmed that it is one's legitimate expectation of privacy, not the particular area searched or seized, which controls. See, e.g., United States v. Salvucci, 448 U. S. 83 (100 SC 2547, 65 LE2d 619) (1980);

---

[6] Apart from any consideration of the Supreme Court's interpretation of the Fourth Amendment in Hester and subsequent cases, this court is free, under the Georgia Constitution, to provide for greater protection of individual rights than under federal law. See Oregon v. Hass, 420 U. S. 714, 719 (95 SC 1215, 43 LE2d 570) (1975); Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv. L. Rev. 489 (1977). See also Wheeler v. State, 659 SW2d 381 (Tex. Ct. Crim. App., decided 9/29/83).

Rakas v. Illinois, supra.[7] The per se "open fields" doctrine, which holds that the Fourth Amendment does not extend to areas outside a dwelling place or its curtilage, is now unsupportable, particularly in light of recent Supreme Court cases recognizing numerous areas outside the curtilage where one may legitimately expect his privacy to be protected from government intrusion. See Reid v. Georgia, 448 U. S. 438 (100 SC 2752, 65 LE2d 890) (1980) (airport concourse); Ybarra v. Illinois, 444 U. S. 85 (100 SC 338, 62 LE2d 238) (1979) (tavern interior); Marshall v. Barlow's, Inc., 436 U. S. 307 (98 SC 1816, 56 LE2d 305) (1978) (business premises); United States v. Chadwick, 433 U. S. 1 (97 SC 2476, 53 LE2d 538) (1977) (automobile); Katz v. United States, supra (telephone booth). See also Hayes v. State, 141 Ga. App. 706 (234 SE2d 360) (1977) (apartment of another); Bowers v. State, 151 Ga. App. 46 (258 SE2d 623) (1979).

In the years since Katz, the Supreme Court has not been called upon to address the continuing validity of the Hester decision.[8] The Court has, however, cited Hester in two relatively recent decisions. In Air Pollution Variance Board v. Western Alfalfa Corp., 416 U. S. 861 (94 SC 2114, 40 LE2d 607) (1974), a state health inspector trespassed on the outdoor premises of a business establishment in order to conduct a pollution test of smoke being emitted from the factory's chimneys. Citing the Hester case, the Court held that the warrantless search was permissible, noting that "[t]he field inspector was on respondent's property but we are not advised that he was on premises from which the public was excluded . . . He had sighted what any one in the city who was near the plant could see in the sky — plumes of smoke." Id. at 865. I think that the circumstances of Western Alfalfa distinguish it from the present case. There the property in question was easily accessible and open to the public, whereas appellant in this case has taken elaborate precautions to exclude the public from his land. Unlike the inspector in Western Alfalfa, Sheriff Greathouse was not in an area accessible to or visible by the public when he made his observations. I agree with the court in State v. Thornton, 453 A2d 489 (Me. 1982), that the "open fields" doctrine is inapplicable where the observing officer is in a place where he has no right to be when the

---

[7] The "open fields" doctrine, as interpreted and employed by most courts, does not place proper emphasis on the "personal privacy" component of the Fourth Amendment recognized in Katz. Instead the doctrine clings to the outmoded "constitutionally protected area" analysis of Olmstead, supra. See United States v. Oliver, 686 F2d 356, 363 (6th Cir. 1982) (Keith, J., dissenting).

[8] Certiorari has been granted, however, in United States v. Oliver, 686 F2d, supra, 51 USLW 3552. That case is currently pending in the Supreme Court.

incriminating observations are made. See also United States v. Oliver, supra; United States v. Holmes, 521 F2d 859 (5th Cir. 1975). In Harris v. United States, 390 U. S. 234 (88 SC 992, 19 LE2d 1067) (1968), a per curiam opinion, the Court cited Hester in support of the proposition that "objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." 390 U. S. at 236. Thus it can be seen that the post-Katz Court has narrowed the Hester case to apply only to observations made from a place where the observing officer was legitimately stationed.

The recent case of Dow Chemical Co. v. United States, 536 FSupp. 1355 (E.D.Mich. 1982) is particularly instructive in resolving the issues presented by this appeal. There the Environmental Protection Agency was conducting an investigation of a 2000-acre Dow manufacturing plant to check for excess pollutant emissions. Following an on-site inspection of the plant, the EPA hired an independent contractor to conduct aerial surveillance and take detailed photographs of the plant without Dow's knowledge. When Dow became aware of the flyover, it sued the EPA, claiming that the agency's warrantless aerial photography of its plant constituted an unreasonable search in violation of the Fourth Amendment. The court agreed, holding that Dow's maintenance of fences, locked gates, and elaborate security systems around its plant manifested its subjective expectation of privacy in the plant. The court continued: "The Fourth Amendment should not be read as to require the citizens or businesses of this nation to take *unreasonable* measures to protect themselves from surreptitious governmental searches. This Court is not prepared to conclude that Dow must build a dome over its entire plant before it can be said to have manifested or exhibited an expectation of privacy." (Emphasis supplied.) Id. at 1365. The court concluded that Dow's manifested privacy expectation was one that society was prepared to accept as reasonable, and rejected the EPA's assertion of the "open fields" doctrine as justification for the search. Summary judgment was granted in favor of Dow, and an injunction entered prohibiting the EPA from conducting further aerial surveillance and photography of the Dow plant. See also Wheeler v. State, 659 SW2d 381 (Tex. Ct. Crim. App., decided 9/29/83).

In light of these authorities, I would hold that a per se application of the "open fields" doctrine to validate warrantless searches of land beyond the curtilage is unacceptable. Accord, Case Comment, United States v. Oliver, 20 Am. Crim. L. Rev. 485 (1983); Note, How Open Are Open Fields?, 14 U. Tol. L. Rev. 133 (1982). This is not to say that a warrantless search of a field will ordinarily violate

the Fourth Amendment. On the contrary, the opposite is true, since "an individual ordinarily has no constitutionally protected right to expect privacy in open fields." Casey v. State, 87 Nev. 413 (488 P2d 546) (1971). I merely conclude, as have many courts, that "Hester no longer has any independent meaning but merely indicates that open fields are not areas in which one traditionally might reasonably expect privacy." United States v. Freie, 545 F2d 1217, 1223 (9th Cir. 1976). See LaFave, Search and Seizure § 2.4(a) (1978).

Another way of stating the same conclusion is this: For the "open fields" doctrine to apply, the searched area must truly be "open" — that is, an area in which no one has exhibited a reasonable expectation of privacy. See Case Comment, United States v. Oliver, supra, at 493 (1983). Webster's Third New International Dictionary defines "open" as follows: "[S]o arranged or governed as to permit ingress, egress, or passage . . . having no enclosing or confining barrier . . . free from fences, boundaries, or other restrictive margins." Common sense dictates that a field not meeting this definition is not "open" for purposes of application of a per se "open fields" exception to the Fourth Amendment. By no stretch of the imagination can appellant's land be characterized as "free from fences, boundaries, or other restrictive margins."

Having rejected the per se approach used by the court below, it remains to answer the question posed by the Katz case: Whether, under these facts, appellant possessed a reasonable expectation of privacy in his fields that was violated by Sheriff Greathouse and the GBI. Katz dictates that we decide, first, whether appellant had an actual, subjective expectation of privacy; and second, whether this expectation is one that society is prepared to recognize as reasonable.

Plainly appellant's actions demonstrated a subjective expectation of privacy in his fields. His land was fenced at all borders, clearly posted "no trespassing," and guarded by two locked gates at the main entrance. The two secluded fields located within appellant's property lines were surrounded by thick forests and undergrowth. Neither field was visible from public roads, neighboring property, or the air. It is difficult to imagine what other precautions appellant could have taken to protect his property against intruders, short of erecting a ten-foot barricade around the land, covering his entire farm with a dome, or posting guards at all borders of his property. Cf. Dow Chemical Co. v. United States, supra.

The second part of the Katz test asks whether appellant's expectation of privacy is one that society is prepared to recognize as reasonable. In applying this part of the test, courts have generally found reasonable expectations that are " 'normally shared by people in that setting' " and " 'fall within the limits of what society can

accept given its interest in law enforcement.' " United States v. Oliver, supra at 372 (Keith, J., dissenting). The practice of erecting a fence or barricade to maintain privacy on land predates the Fourth Amendment and appears to be nearly as old as civilization itself. Nine hundred years ago, a medieval English landowner whose property was overrun by intruders had to at once assemble an army and retake his property by force. If he failed, the land became the lawful property of the usurper. See Bracton, On the Laws and Customs of England, Vol. II, p. 155 (Thorne ed. 1968). In time, English landowners began to protect their lives and property by building walls around their homes, storage houses and servants' quarters. This was for the purpose of forestalling surprise attacks and to give the defending landowners the advantage when attacked. This protected area, which included the homestead and its immediate surroundings, became known as the "curtilage" at common law. See Bare v. Commonwealth, 122 Va. 783 (94 SE 168) (1917).

In this country, the use of fences and barricades has always played an important part in defining landowners' right to privacy. In the 1800's in the Midwest and West, the open range was used by everyone. Violence erupted when squatters, farmers and cattle ranchers claimed the same land as their own. By the 1880's, it became a common practice to erect barbed-wire fences at one's claimed property line. See Billington, Westward Expansion, 595-98 (4th Ed. 1974). A landowner's erection of such a fence said, in effect: "This land is mine, I intend to put it to use, and I demand that all respect my ownership and privacy." More recently, enactment of "no fence" laws in this country meant that a landowner no longer had to construct a fence to protect his farmlands and his privacy from another's domestic animals which are left to run free. See 1933 Code of Georgia, § 62-501 et seq.; Thombley v. Hightower, 52 Ga. App. 716, 719 (184 SE 331) (1935). The law has evolved through history toward general recognition that an owner of land has a right to use his land as he pleases, free from trespass or intrusion, without having to build a fort around it as in common law days. Appellant's erection of fences, no trespassing signs, and locked gates around his land, then, should be recognized for what it is — a reasonable and established method of protecting his privacy in the enclosed land. This is particularly true in agricultural states such as Georgia, where one's land is often his only source of livelihood. LoGuidice's expectation of privacy is one that society in general, and Georgia in particular, recognizes as "reasonable."

One commentator has aptly observed that application of the Katz standard is, at bottom, "a value judgment. It is whether, if the particular form of surveillance practiced by police is permitted to go

unregulated by constitutional restraints, the amount of privacy and freedom remaining to citizens would be diminished to a compass inconsistent with the aims of a free and open society." Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L. Rev. 349, 403 (1974).

In my view the Fourth Amendment at a minimum means that law enforcement officers may not conduct "fishing expeditions" on private, posted and fenced property, trespassing thereupon at will for a period of several months until they discover "open fields" containing incriminatory evidence. When conducted on fenced property, such activity is clearly inconsistent with the aims of a free and open society, and flies in the face of a reasonable, clearly exhibited expectation of privacy. Amsterdam, supra. Individuals in circumstances similar to LoGiudice's would, I believe, expect their privacy to be invaded only upon issuance of a valid search warrant. Moreover, this reasonable expectation of privacy would not unduly hamper legitimate law enforcement and investigative activities, such as verifiable tips from reliable informants, or aerial fly-over searches from appropriate heights. See, e.g., *Reece v. State,* 152 Ga. App. 760 (264 SE2d 258) (1979); People v. Sneed, 32 Cal. App. 3d 535, 108 Cal. Rptr. 146 (1973).

Because in this appeal the state has relied solely on the "open fields" exception in its attempts to validate the warrantless search of appellant's land, I will address other possible justifications for the search only briefly. The state, of course, assumes the burden of proving that an exception to the Fourth Amendment's general warrant requirement applies. United States v. Jeffers, 342 U. S. 48, 51 (72 SC 93, 96 LE 59) (1951); OCGA § 17-5-30 (b) (Code Ann. § 27-313). It is interesting to note that Sheriff Greathouse and the GBI agents surreptitiously entered appellant's land on two occasions, making prolonged observations, before seeking a search warrant. This conduct was in itself a tacit admission that the officers lacked the probable cause necessary to secure a search warrant when they first trespassed on appellant's land.[9] Nor is there any evidence of exigent circumstances, such as possible destruction of the marijuana plants, which would excuse the officers' failure to obtain a warrant

---

[9] See n. 4, supra. It is important to remember that "probable cause" and "reasonable expectation of privacy," while interrelated, are separate and distinct concepts of law. An officer of the state with probable cause, that is, a reasonable belief that a crime has been or is being committed, Brinegar v. United States, 338 U. S. 160, 175-76 (69 SC 1302, 93 LE 1879) (1949), may obtain an arrest warrant or a search warrant. Once probable cause has been shown, the individual's expectation of privacy vanishes. The concepts are thus in a sense mutually exclusive ones, and cannot coexist in the same point in time.

prior to entering the land. The reports from local citizens concerning heavy equipment operations at night on the land and the laying of water pipe, coupled with an anonymous, uncorroborated tip of illegal activity on the land, does not amount to probable cause to issue a search warrant. Operation of heavy farm machinery, even at night, is commonplace in today's farming world. The reports concerning appellant's water pipes are likewise not indicative of any criminal activity. In addition, there is no evidence in the record that a reliable source ever observed marijuana growing on the land.

It is inconceivable to me that this court would condone the outrageous, illegal investigative activities carried on by law enforcement officials in this case. To sanction this search is to say that law enforcement officers may freely trespass on fenced, posted, secluded rural property without regard for the privacy of persons under the Fourth Amendment. This view too easily defers to the judgment of officers of the law who are, after all, only human, and are sometimes overzealous in their pursuit of "the often competitive enterprise of ferreting out crime." Johnson v. United States, 333 U. S. 10, 14 (68 SC 367, 92 LE 436) (1948). Such a view also derogates unnecessarily from the importance of the rights and values the Fourth Amendment was designed by the founding fathers to protect — rights just as important as freedom of religion, of speech and the press, the right to a jury trial and to trial counsel, due process, freedom from quartering soldiers in one's home in peacetime, and the other precious liberties safeguarded by the Bill of Rights.[10] As Justice Brandeis pointed out in his famous dissent in Olmstead v. United States, 277 U. S. 438, supra, the Fourth Amendment guarantees "the right to be left alone — the most comprehensive of rights and the right most valued by civilized men." Id. at 478.

I would therefore reject the per se "open fields" doctrine employed by the Court of Appeals and sanctioned by this court in this and previous cases. Because the seized evidence was observed by officers who were in a place they had no right to be in violation of appellant's justifiable expectation of privacy, those officers'

---

[10] History shows that the main impetus behind the adoption of the Bill of Rights in 1791 was the protection of individual civil rights from unwarranted governmental intrusion. In Congressional debates on the proposed amendments, James Madison stated: "I believe the great mass of the people who opposed [the Constitution as originally ratified] disliked it because it did not contain effectual provisions against the encroachment on particular rights and those safeguards which they have long been accustomed to have interposed between them and the magistrate who exercises the sovereign power." Annals of Congress, 1st Cong., 1st Sess., p. 450. See also Lasson, The History and Development of the Fourth Amendment 87 (1937).

observations and the seized evidence should have been suppressed. To hold otherwise makes the "open fields" doctrine a carte blanche authorization to law enforcement officers to trample and roam at will over fenced, posted private property outside of the curtilage without a warrant. Where a landowner has demonstrated to outsiders that he intends to shut them out, some degree of constitutionally protected privacy attaches. The protection against illegal searches and seizures accorded by the Fourth Amendment does not vanish where the curtilage line ends.

In conclusion, I can only echo the sentiments of Justice Brennan: "Although I recognize that the traffic in illicit drugs is a matter of pressing national concern, that cannot excuse this Court from exercising its unflagging duty to strike down official activity that exceeds the confines of the Constitution. In discussing the Fourth Amendment in Coolidge v. New Hampshire, 403 U. S. 443, supra, Justice Stewart stated: 'In times of unrest, whether caused by crime or racial conflict or fear of internal subversion, this basic law and the values that it represents may appear unrealistic or 'extravagant' to some. But the values were those of the authors of our fundamental constitutional concepts.' Id. at 455 (plurality opinion) We must not allow our zeal for effective law enforcement to blind us to the peril to our free society that lies in this Court's disregard of the protections afforded by the Fourth Amendment." Florida v. Royer, —— U. S. ——, (103 SC 1819, 75 LE2d 229) (1983) (Brennan, J., concurring specially).

I respectfully dissent.