# CRIMINAL CASES

Richmond.

## BARE V. COMMONWEALTH.

### November 15, 1917.

1. INSTRUCTIONS—*Repetition.*—The failure of the trial court to give certain instructions at the request of the accused, which fairly and properly stated propositions of law upon which the accused had a right to rely, was not error, where these propositions were fully covered by instructions given at the instance of the Commonwealth, though the rejected instructions expressed these statements of law with greater emphasis. It is objectionable to multiply instructions which repeat the same propositions of law in different terms; therefore, it is not error to select between the two sets of instructions equally unobjectionable and to refuse to multiply instructions substantially the same in legal effect.

2. CRIMINAL LAW—*Arraignment and Plea—Misdemeanor.*—Virginia Code, 1904, section 4012, provides: "In prosecutions for misdemeanors, in cases not embraced by section 4010, after a summons has been executed ten days before the first day of the term of court, or if the accused was admitted to bail and made default, the court may either award a *capias* or proceed to trial, in the same manner as if the accused had appeared and pleaded not guilty." If the accused is absent, no arraignment can be made because of his absence, but nevertheless the court may proceed to trial just as if he had appeared and pleaded not guilty. If he is present when his case is called, he should plead, if he desires to make defense, and if he goes to trial without pleading, he thereby waives his right to do so. While arraignment is necessary in felony cases, it is not necessary in misdemeanors.

3. INTOXICATING LIQUORS—*Evidence—Chemist's Analysis—Letter of Commissioner of Agriculture.*—The Mapp act, Acts 1916, chapter 146, section 30½, makes it the duty of the State Commis-

sioner of Agriculture, upon the written request of the proper official, to cause an analysis to be made of any mixture supposed to contain ardent spirits, and to return to the officer making such request the certificate of the chemist making the analysis. While only the certificate of the chemist is made evidence by the statute, such certificate is not evidence unless the Commissioner of Agriculture, in accordance with the statute has caused the analysis to be made, nor unless he also returns the chemist's certificate to the officer who has in writing requested such analysis. Accordingly, the letter of the commissioner accompanying the certificate of the chemist is admissible. And in the instant case the variance between the date of the letter of transmittal from the Commissioner of Agriculture, December 5, 1916, and the date of the affidavit of the chemist, the 15th day of December, 1916, was held immaterial, although it should have been explained.

4. "DWELLING"—"*Dwelling House.*"—As construed by the courts from the earliest to the latest times, the words "dwelling" or "dwelling house" have been construed to include not only the main house, but all of the cluster of buildings convenient for the occupants of the premises, generally described as "within the curtilage."

5. "CURTILAGE."—In England the curtilage seems to have included only the buildings within the inner fence or yard, because there, in early times, for defense, the custom was to enclose such place with a substantial wall. In this country, however, such walls or fences, in many cases, do not exist, so that with us the curtilage includes the cluster of buildings constituting the habitation or dwelling place, whether enclosed with an inner fence or not.

6. INTOXICATING LIQUORS — "*Home*"—*Permanent Residence—Mapp Act.*—Accused was convicted under an indictment charging him with unlawfully dispensing and giving away cider containing more than one per cent. of alcohol by volume, in violation of the prohibition act, Mapp law, Acts 1916, page 216. The trial court after instructing the jury that accused had the right to give away intoxicating liquor in his home, further told the jury that "the definition of the word home, in the sense in which that word is used in the law in this connection, cannot be extended to and does not include" an outhouse seventy-five or eighty feet from the dwelling of accused, between which and his dwelling were other small structures—as one of the witnesses says, "probably a pig pen and smoke-house"—and beyond which his barn and a small chicken house were located.

*Held:* That the court erred in instructing the jury that the out-

house was not a part of the home of the accused. In such cases, if there be any doubt as to whether the building is a part of the *bona fide* home of the accused and his family, then the question should be submitted to the jury to determine from the evidence the question of fact involved.

7. INTOXICATING LIQUORS — *"Home"—Permanent Residence—Mapp Act.*—As used in the Mapp act, the words "home" and "permanent residence" must be construed to mean the place of residence rather than any particular building which may be at that place. And the words "in his own home," "in his home," "at his home" and "permanent residence of the person and his family" have substantially the same meaning, namely, anywhere within the curtilage. Except as to the places expressly excluded by this and the other sections of the act, the word "home," as used in the act, includes the curtilage and entire cluster of buildings used by the family as a habitation.

Error to a judgment of the Circuit Court of Rockingham county.

*Reversed.*

The opinion states the case.

*C. R. Wingfield,* for the plaintiff in error.

*John Garland Pollard, Attorney-General, J. D. Hank, Jr., Assistant Attorney-General,* and *Leon M. Bazile,* for the Commonwealth.

PRENTIS, J., delivered the opinion of the court.

The petitioner was convicted under an indictment charging him with unlawfully dispensing and giving away cider containing more than one per cent. of alcohol by volume, in violation of the prohibition act (the Mapp law, Acts 1916, p. 216), and sentenced to pay a fine of fifty dollars and be imprisoned in the county jail for one month and afterwards until the fine and costs are paid.

The pertinent facts are, that the accused manufactured

99

cider "from fruit of his own raising" and stored the same in an outhouse seventy-five or eighty feet from his dwelling, between which and his dwelling were other small structures—as one of the witnesses says, "probably a pig pen and smokehouse"—and beyond which his barn and a small chicken house were located. This outhouse was about ten by twelve feet in size, was built for a grain house and used for the storage of the cider, for molasses intended for the family use, and other food such as apples, beans, etc., had sometimes been kept there. In this house were one barrel of such cider, and one-half barrel of it intended for vinegar, in which yeast had been put by the wife of the accused in order to hasten its fermentation. A number of visitors had been given cider taken from these receptacles, and in this outhouse, though there is no evidence of any concealment, disorder or intoxication.

Before discussing the main point at issue, it is proper to refer to certain other assignments of error.

1. It is objected that the court failed to give certain instructions, marked severally, A, E, and F. It is sufficient to say of these instructions that, while they fairly and properly state propositions of law upon which the accused had a right to rely, they are fully covered by instructions 1, 2 and 3 which were given by the court at the instance of the Commonwealth. These instructions which were given, fairly told the jury that the prisoner could not be convicted unless the cider contained more than one per cent. of alcohol by volume, nor unless his guilt was proved beyond a reasonable doubt, and that the accused had the right to manufacture cider of any strength from fruit of his own raising for domestic consumption at his home; and this in substance is all that was in the instructions which were refused, though the rejected instructions expressed these statements of law with greater emphasis. They were doubtless refused by the trial court for the very good reason

that it is objectionable to multiply instructions which repeat the same propositions of law in different terms. All of these instructions might have been given, but it was not error to select between the two sets of instructions equally unobjectionable and to refuse to multiply instructions substantially the same in legal effect.

2. There is another exception based upon the fact that the prisoner was not arraigned and no plea was entered by him.

We have a statute in Virginia (section 4012 of the Code), which reads as follows: "In prosecutions for misdemeanors, in cases not embraced by section 4010, after a summons has been executed ten days before the first day of the term of court, or if the accused was admitted to bail and made default, the court may either award a *capias* or proceed to trial, in the same manner as if the accused had appeared and pleaded not guilty."

Certainly, if the accused is absent, no arraignment can be made because of his absence, but nevertheless the court may proceed to trial just as if he had appeared and pleaded not guilty. If he is present when his case is called, he should plead, if he desires to make defense, and if he goes to trial without pleading, he thereby waives his right to do so. While arraignment is necessary in felony cases, it is not necessary in misdemeanors. In *McKeever* v. *Commonwealth*, 98 Va. 864, 36 S. E. 995, in which the accused was charged with a misdemeanor, he did not plead, and this was regarded as immaterial by this court. The defendant should plead when he has the opportunity to do so, but if he does not, he cannot thereafter take advantage of such irregularity.

3. Another assignment of error grows out of the following state of facts: The Commonwealth, proceeding under section 30½ of the act, had secured from the Commissioner of Agriculture a certificate showing the alcoholic contents

of the two samples of cider which had been taken from the accused. That paper reads thus:

.―"DEPARTMENT OF AGRICULTURE AND IMMIGRATION
"G. W. KOINER, *Commissioner.*

"RICHMOND, VA., *December 5th, 1916.*

"Analysis No. 8260-8261.   Office No. 4334.

"MR. FRANK L. DOVEL, *Chief of Police,*
"*Harrisonburg, Va.*
"Dear Sir:
"Below you will find the analysis of the sample as numbered above.   Which is labelled 2 bottles of cider for analysis.
"Very respectfully,
. "G. W. KOINER,
"*Commissioner.*
"DIVISION OF CHEMISTRY.
"J. B. WEEMS, *State Chemist.*
"MR. G. W. KOINER, *Commissioner,*
"Dear Sir:
"The following is the analysis of the sample numbered as above, received from you:
"8260 No. 1 Alcohol by volume 5.51 per cent.
"8261 No. 2 Alcohol by volume 2.89 per cent.
"Very respectfully,
"C. M. BRADBURY,
"*Chemist.*"

This certificate was obtained under section 30½ of the prohibition act, which makes it the duty of the State Commissioner of Agriculture, upon the written request of the proper official, to cause an analysis to be made of any mix-

ture supposed to contain ardent spirits, and to return to the officer making such request the certificate of the chemist making the analysis.

The accused moved the court to instruct the jury to disregard that part of the paper which appeared above the signature of G. W. Koiner, commissioner, which the court refused to do. The variance between the date of the letter of transmittal from the Commissioner of Agriculture, December 5, 1916, and the date of the affidavit of the chemist, the 15th day of December, 1916, should have been explained, nevertheless the court correctly refused the instruction asked for by the accused. The statute not only makes it the duty of the Commissioner of Agriculture to cause the mixture to be analyzed, but also requires him to return to the officer making the request the certificate of the chemist showing such analysis, so that the letter of the commissioner transmitting the chemist's certificate identifies it. The two papers combined tend to indicate compliance with the statute. While it is true that only the certificate of the chemist is made evidence by the statute, such certificate is not evidence unless the Commissioner of Agriculture, in accordance with the statute, has caused the analysis to be made, nor unless he also returns the chemist's certificate to the officer who has in writing requested such analysis. *Gayle & Eason* v. *Commonwealth*, 115 Va. 958, 80 S. E. 741. When they are combined they indicate a compliance with the statute, while separated they would be meaningless and ineffective. We can only speculate as to why the Commissioner of Agriculture transmitted the certificate on the 5th of December while the certificate itself was not sworn to until the 15th of December. Possibly when first transmitted the certificate had not been sworn to. If this be true, the proper course was to supply the deficiency and have the affidavit made as promptly as possible. However this may be, the court rightly refused to instruct the jury to disregard

the letter signed by the Commissioner of Agriculture with which the chemist's certificate was transmitted and by which it was authenticated.

4. The main point at issue is clearly presented in the record by instruction No. 2, which the court granted at the instance of the Commonwealth, and instructions B and C which were asked for by the accused and refused.

Instruction No. 2, given at the instance of the Commonwealth, reads as follows: "The court instructs the jury that while the law of this State allows a person to make cider of any strength from fruit of his own raising, for domestic consumption at his own home; and furthermore, allows one in his own home to give ardent spirits, including cider of more than one per cent. alcohol, to another person, or to other persons, yet the right to give to another person cider containing more than one per cent. of alcohol, by volume, or any other ardent spirits, can only be exercised in the home of the giver, and the court further tells the jury that the definition of the word home, in the sense which that word is used in the law in this connection, cannot be extended to, and does not include, the outhouse mentioned in the evidence in which the accused kept his cider, and therefore that if the jury believe from the evidence beyond reasonable doubt that the cider dispensed or given away by the defendant, after November 1, 1916, as shown in the evidence, contained at the time more than one per centum of alcohol, by volume, then they should find the accused guilty as charged in the indictment and fix his punishment at a fine of not less than $50.00 and not more than $500.00, and confinement in jail for not less than one month and not more than six months."

From this instruction it appears that the court, after telling the jury that the accused had the right to give away intoxicating liquor in his home, further told the jury that "the definition of the word home, in the sense in which that

word is used in the law in this connection, cannot be extended to and does not include the outhouse mentioned in the evidence in which the accused kept his cider." This, as will be noted, took the question away from the jury and in effect instructed them to find the accused guilty.

Instructions B and C, tendered by the accused, read thus:

B. "The court instructs the jury that the word home as used in the law here to be applied, means the permanent residence, or abiding place of a person (other than a club, hotel, boarding house, etc.) and includes with the actual dwelling house, or place, all outbuildings commonly used and intended for necessary or convenient use in connection with the use of the whole as a home.

"Whether or not the cider given away by the accused was at time of such giving of a greater strength than is by law allowed, where the giving is not shown to be within the home of the giver, and whether or not the giving occurred within the home of the accused, are questions of fact to be determined by the jury, upon the evidence."

C. The court instructs the jury that a person having a home, as defined by law, and by the instructions given, may lawfully give away cider, in such home, provided that such giving is in no wise a shift or device to evade the provisions of the law. And the court further instructs the jury that if they believe from the evidence that the giving of cider by the accused, as charged in the indictment, and shown in the evidence, occurred only within the home of the accused, in the sense in which home has been defined to them, and that such giving was in no wise a shift or device to evade the provisions of the law, they will find the accused not guilty."

From these latter instructions it appears that the prisoner asked the court to instruct the jury that the word "home," as used in the act, includes with the actual dwelling house, or place, all outbuildings commonly used and in-

tended for necessary or convenient use in connection with the use of the whole as a home, and to submit to the jury, upon the evidence, the question whether or not the giving occurred within the home of the accused, as thus defined; and instruction C cautioned the jury that in order to acquit the prisoner they must further believe that such action on his part was in no wise a shift or device to evade the provisions of the law. So that the issue is thus very clearly presented as to the proper construction to be given the several provisions in the act authorizing the dispensing of intoxicating liquors in the home.

Section 8 of the act allows the manufacture and domestic use of cider from fruit of the owner's own raising "at his home." Section 16 prohibits the giving away of ardent spirits in any place "except in a *bona fide* 'home.'" Section 39 permits the transportation of ardent spirits in small quantities by common carriers, and requires the consignee to make affidavit that the liquor received is for "his own use in his own home," and authorizes any person to carry it "in his baggage for the *bona fide* use of himself or his family." Section 42 refers to a *"bona fide* home." Section 61 reads thus:

"Nothing in this act shall prevent one, in his own home, from having and there giving to another, ardent spirits, when the quantity of such spirits shall not exceed the quantity allowed by this act, to be kept in his home, and such gift is in no wise a shift or device to evade the provisions of this act; but the word 'home,' as used herein, shall be the permanent residence of the person and his family, and shall not be construed to include a club, fraternity house, lodge room or rooms, or place of common resort, or room of a guest in a hotel or boarding house, provided that any transient guest may carry in his baggage for the *bona fide* use of himself or family not in excess of one quart of ardent spirits, the same not to be opened or used, or

given away by such transient guest during his stay in said hotel or boarding house."

Section 65 makes the possession of ardent spirits, in certain quantities *prima facie* evidence of intent to sell in any prosecution under the act, and uses the expressions, "his home," "in his home," "to his own home," and "at the home."

We know of no analogy in the law for the construction of this language, except such as is found in the common and statute law referring to arson, burglary, and to homicide and assault cases, where the prisoner claims to have committed the alleged crime in self defense after having retreated to his castle, or his home. As construed by the courts from the earliest to the latest times, the words "dwelling" or "dwelling house" have been construed to include not only the main house, but all of the cluster of buildings convenient for the occupants of the premises, generally described as "within the curtilage."

Sir Mathew Hale says: *"Domus mansionalis* doth not only include the dwelling house but also the outhouses that are parcel thereof * * * if they are parcel of the messuage, though they are not under the same roof, or joining contiguous to it." Hale's Pleas of the Crown (558).

Blackstone (4 Bl. m. p. 225) announces the same doctrine, saying that if the houses are within the common fence, though not under the same roof or contiguous, a burglary may be committed therein "for the capital house protects and privileges all its branches and appurtenances, if within the curtilage or homestall."

In 3 Greenleaf (2d ed.), sec. 80, we find this succinct and comprehensive statement: "The term 'mansion,' or 'dwelling house,' comprehends all the outbuildings which are parcel thereof, though they be not contiguous to it. All buildings within the same curtilage or common fence, and used by the same family, are considered by the law as parcel of

the mansion. If they are separated from the dwelling house, and are not within the same common fence, though occupied by the same owner, the question, whether they are parcel of the mansion or not, is a question for the jury upon the evidence."

Mr. Bishop says: "A dwelling house need not be under one roof. It may be a cluster of separate buildings, and it includes the outhouses and buildings in the cluster, appurtenant and auxiliary, being parcel of the messuage and within the curtilage, and which are subservient to the main dwelling for the purpose of habitation." 2 Bish. Cr. Law (7th ed.), sec. 104; *State* v. *Wilson*, 2 N. C. 242; *Pitcher* v. *People*, 16 Mich. 147.

Pendleton, P., in *Commonwealth* v. *Posey*, 4 Call (8 Va.) 122, 2 Am. Dec. 560, says: "Dwelling house is a complex term, and scarcely more certain than house; for it is not confined to any particular room in the building, nor even to the same room, but it extends to all the houses belonging to the curtilage."

In *Page* v. *Commonwealth*, 26 Gratt. (67 Va.) 947, Moncure, P., says: "An outhouse, adjoining a dwelling house, or under the same roof, or within the curtilage thereof and occupied therewith, was considered, at common law, as part and parcel of the dwelling house, within the meaning of the law concerning arson and burglary."

In England the curtilage seems to have included only the buildings within the inner fence or yard, because there, in early times, for defense, the custom was to enclose such place with a substantial wall. In this country, however, such walls or fences, in many cases, do not exist, so that with us the curtilage includes the cluster of buildings constituting the habitation or dwelling place, whether enclosed with an inner fence or not.

In *Pond* v. *People*, 8 Mich. 150, it was held in a case in which the prisoner was charged with murder, that a build-

ing thirty-six feet distant from the prisoner's house, used for preserving the nets employed in the owner's ordinary occupation as a fisherman, and also as a dormitory for his servants, is in law a part of his dwelling, though not included with the house by a fence, and that a fence is not necessary to include buildings within the curtilage if within a space no larger than that usually occupied for the purposes of the dwelling and customary outbuildings.

It would seem that the special privileges pertaining to a man in his own habitation are available for his protection only while he is in such space as is usually occupied for the purposes of the dwelling and the customary outbuildings. *Lee* v. *State*, 92 Ala. 15, 9 So. 407, 25 Am. St. Rep. 17; *People* v. *Taylor*, 2 Mich. 250.

The curtilage of a dwelling house is a space necessary and convenient, habitually used for family purposes and the carrying on of domestic employment; the yard, garden or field which is near to and used in connection with the dwelling. 3 Cyc. 988; *Washington* v. *State*, 82 Ala. 31, 2 So. 356; *Cook* v. *State*, 83 Ala. 62, 3 So. 849, 3 Am. St. Rep. 688; *State* v. *Shaw*, 31 Me. 523; *Commonwealth* v. *Barney*, 10 Cush. (64 Mass.) 480; *Unseld* v. *Commonwealth*, 140 Ky. 529, 131 S. W. 263, 140 Am. St. Rep. 393.

Coming to the case and statute under consideration, it seems evident from such analogy as well as in accord with common understanding and acceptation that the words "home" and "permanent residence" must be construed to mean the place of residence rather than any particular building which may be at that place. It is the home which is loved, the spot to which when absent we expect to return, and which is idealized in our favorite song; that place, or castle, which no man may enter without the consent of the owner, and in defense of which, and of every part of which, the taking of human life has been frequently excused.

The contention that the keeping and giving away of

**ardent** spirits in this State, under this statute, must be confined to a particular building at such home, would lead to the grossest discrimination. In the case under consideration, where the evidence shows that the accused is a small farmer, that his main dwelling is small, and in which there is no suitable place in which to store his barrels of cider, if the contention of the Commonwealth be correct, this man could not store any cider of his own manufacture from fruit of his own raising, because all the available space in such main dwelling is already fully occupied. The statute accords the privilege to all who occupy a *bona fide* home, while such a construction would restrict and limit it to those only who occupy large houses with wine cellars or other ample places for the storage of liquor. In many *bona fide* homes in Virginia there are no such facilities, in some instances the entire family do not sleep under the same roof, but either regularly or at times, because of the crowded condition of the main house, must sleep in other buildings which are within the yard or curtilage. In many other instances the kitchen, or dining room, or both, or store rooms, are detached buildings and not under the same roof with the main dwelling house. It is perfectly clear that words "at his home," as used in the statute, mean anywhere within the curtilage, as from time immemorial defined. We think that the words "in his own home," "in his home" and "permanent residence of the person and his family," as used in section 61, should be construed to have substantially the same meaning as the words "at his home." This construction is greatly strengthened by section 61 itself, which apparently recognizes the inclusive meaning of the word "home" by expressly excluding certain places which would otherwise be construed to come within such definition—that is, by providing that no club, fraternity house, lodge room or rooms, or place of common resort, or room of a guest in a hotel or boarding house, shall be construed

as included within the definition.  But for this exclusion many of the places indicated could and should be construed as the permanent home of a person and his family.  Except as to the places expressly excluded by this and the other sections of the act, the word "home," as used therein, includes the curtilage and entire cluster of buildings used by the family as a habitation.

It follows, therefore, that we are of opinion that the court erred in instructing the jury that the outhouse in which the cider was dispensed was not a part of the home of the accused.  In such cases, if there be any doubt as to whether the building is a part of the *bona fide* home of the accused and his family, then the question should be submitted to the jury to determine from the evidence the question of fact involved.  The instructions B and C, requested for the accused and refused by the court, are in accord with this view, were clearly right under the evidence in this case, and should have been given to the jury.

For the error of the court in refusing to give these two instructions, the judgment must be reversed, the verdict of the jury set aside, and the cause remanded for a new trial to be had in accordance with the views herein expressed.

*Reversed.*