## Richmond

CARY MONTAGUE WELLFORD

V.

COMMONWEALTH OF VIRGINIA

Record No. 830481.

April 27, 1984.

Present: Carrico, C.J., Poff, Compton, Stephenson, Russell and Thomas, JJ., and Gordon, Retired Justice.

*Michael D. Morchower (Eric D. White; Morchower & Luxton*, on briefs), for appellant.

*James E. Kulp, Senior Assistant Attorney General (Gerald L. Baliles, Attorney General*, on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

In this marijuana case, the sole question is whether the contraband was located within the curtilage of a dwelling or within an open field when subjected to a warrantless search and seizure.

Indicted for feloniously manufacturing marijuana not for his own use, Code § 18.2-248.1(c), Cary Montague Wellford was found guilty by a jury of possession of the drug. Confirming the verdict, the trial court sentenced defendant to jail for 30 days and to pay a fine of $500.00. Execution of the sentence was suspended pending this appeal.

In August of 1982, Thomas Dabney Wellford, a clergyman, owned a 230-acre tract of land in Richmond County on which he resided. The tract included a 25-acre cornfield. The field was about one-fourth of a mile from the Wellford dwelling and was separated from the vicinity of the dwelling by a wooded area. The cornfield was bordered by the trees on one side, by a large em-

bankment and a creek on another side, and by other fields. The field was not visible from any public road or from the bottom of the embankment.

The property was under the care and control of defendant, the clergyman's 31-year-old son. About six years earlier, the owner orally had leased the property to the son. Under the agreement, defendant maintained the land, farmed it, and provided for security of the property. Although the record is unclear, defendant at the time in question apparently was "living" in the dwelling on the farm.

The record does not reveal whether any of the land was fenced. The evidence shows, however, that approximately 20 to 30 signs had been posted, many erected by defendant.They read either "Private Property—Keep Out" or "Private Property—No Trespassing" or "Posted—No Hunting." Signs were situated at entrances to the property and along the boundary lines. Testimony indicated that parishioners of the owner often visited him at home without first obtaining permission to enter the property, that his friends were given permission to hunt on the land, and that a tenant who farmed some of the owner's property crossed the leased premises from time to time.

On August 23, Virginia State Trooper Michael W. Slaw received information that marijuana probably was growing in a field near the Wellford residence. On August 24, Slaw and a county deputy sheriff made a daytime flight over the property and conducted aerial surveillance from about one thousand feet. They observed marijuana growing in the cornfield.

Upon landing, the officers drove to the Wellford property, entered from a public highway, travelled a distance on a private road past the Wellford home, stopped their vehicle, and walked about one-eighth of a mile to the cornfield. They observed, adjacent to the line of trees, 65 marijuana plants, ranging in height from three to ten feet, growing among the cornstalks. The plants "had started to [grow] overtop of the corn."

During the next two days, August 25 and August 26, the officers went upon the property, using the same route for access, and staked out the marijuana during the daylight hours seeking unsuccessfully to ascertain who was cultivating the plants. On August 27, during a similar stakeout, the officers observed defendant walk through the woods and approach the marijuana about 5:00 p.m. He inspected the plants and cut weeds from around them. After

nearly seven minutes, defendant apparently noticed the deputy sheriff, said "oops," and quickly left the field before the officers could arrest him. The trooper had taken photographs of the defendant walking among the plants from the officer's position in a tree. Next, the officers removed the plants from the field, took samples for laboratory testing, and arrested the defendant later that day.

During the four-day period, the officers did not seek permission to go on the property nor did they try to obtain a search warrant. The trooper attended the elder Wellford's church and knew he was on vacation during the time in question. The trooper admitted there was nothing to preclude him from seeking a search warrant from the local magistrate.

After indictment, defendant filed a motion to suppress the contraband upon the ground that the search and seizure violated his Fourth Amendment rights. Upon considering the evidence during a pre-trial hearing, the trial court denied the motion. The court ruled that a warrant was unnecessary for the officers lawfully to search for and seize the contraband because the so-called "open fields" doctrine applied. That action of the court below generates the issue on appeal.

On brief, defendant argues that the warrantless seizure of marijuana from an area, as here, in which he had a reasonable expectation of privacy, is not excused under the "open fields" doctrine or cured by any other exception to the warrant requirement. Responding, the Attorney General does not rely on any of the recognized exceptions to the warrant requirement. Rather, he argues that the Fourth Amendment protection does not extend to open fields. He contends that "[b]y its very nature the concept of an open field is inconsistent with a reasonable expectation of privacy." Thus, he urges, the defendant had no right to expect privacy in the field in question which, the Attorney General says, was not a part of the curtilage of the Wellford dwelling.

In *Hester* v. *United States*, 265 U.S. 57 (1924), the Supreme Court, in an opinion by Justice Holmes, unanimously held that "the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects,' is not extended to the open fields. The distinction between the latter and the house is as old as the common law." *Id*. at 59. Virginia had recognized this concept in *McClannan* v. *Chaplain*, 136 Va. 1, 116 S.E. 495 (1923). "It is too manifest for further elaboration

that the search, without a warrant, of the plaintiff's premises, remote from his home and curtilage, and not even in his personal presence, was not an 'unreasonable' search, and hence was not forbidden by the common law." *Id.* at 17, 116 S.E. at 499.

█ The viability of the "open fields" doctrine established in *Hester* has been the subject of much debate since the decision in *Katz* v. *United States*, 389 U.S. 347 (1967). *Katz* held that "the Fourth Amendment protects people, not places." *Id.* at 351. The Court rejected the parties' complete reliance on "place" and said "the correct solution of Fourth Amendment problems is not necessarily promoted by incantation of the phrase 'constitutionally protected area.' " *Id.* at 350. The Court held that the Fourth Amendment protects persons where they have a justifiable expectation of privacy. *Id.* at 353.

In the subsequent application of *Katz*, the analysis of Justice Harlan in his concurring opinion in that case has been employed. He noted that in determining what protection the Fourth Amendment affords to people, there must be some reference to a "place." He said that such protection is afforded if, first, a person has exhibited an actual, subjective expectation of privacy in the subject area and, second, if that expectation is one that society is prepared to recognize as "reasonable." *Id.* at 361. *See, e.g., United States* v. *Knotts*, 460 U.S. 276 (1983); *Rakas* v. *Illinois*, 439 U.S. 128, 143 n.12 (1978); *Patler* v. *Slayton*, 503 F.2d 472 (4th Cir. 1974); *State* v. *Brady*, 406 So.2d 1093 (Fla. 1982), *cert. granted sub nom. Florida* v. *Brady*, 456 U.S. 988 (1982).[1]

Ten days ago, however, and after the present case had been briefed and argued fully, the Supreme Court clarified the "confusion that has arisen as to the continued vitality of the ['open fields'] doctrine." *Oliver* v. *United States*, 104 S.Ct. 1735 (1984). In cases from Kentucky and Maine with facts strikingly similar to the facts in the present case, the Court reaffirmed the *Hester* "open fields" concept. Justice Powell, writing for the majority, said: "We conclude, as did the Court in deciding *Hester* v. *United States*, that the government's intrusion upon the open fields is not one of those 'unreasonable searches' proscribed by the text of the Fourth Amendment." *Oliver* v. *United States*, 104 S.Ct. at 1740. Citing *Katz*, the Court noted that: "The Amendment does not

---

[1] For cases discussing aerial observation or surveillance as violative of Fourth Amendment guaranty against unreasonable search and seizure, see *Burkholder* v. *Superior Court*, 96 Cal.App.3d 421, 158 Cal.Rptr. 86 (1979); Annot., 56 A.L.R. Fed. 772 (1982).

protect the merely subjective expectation of privacy, but only 'those expectations that society is prepared to recognize as "reasonable."' " *Id.* at 1740.

Continuing, the Court stated that the rule of *Hester* "may be understood as providing that an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." *Id.* at 1741. The Court observed that the common law distinguished "open fields" from the "curtilage" (land associated with the home) and said that courts have extended Fourth Amendment protection to the curtilage. *Id.* at 1742. The Court stated that curtilage has been defined, as at common law, "by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." *Id.*

The defendant in the present case, anticipating the Supreme Court's decision in *Oliver*, appropriately narrowed the issue during oral argument. Responding to questions from the bench, defense counsel took the position that unless the cornfield was a part of the curtilage, the search and seizure was valid.[2] The question, therefore, is whether the trial court erred in finding from the evidence that the cornfield was outside the curtilage.

█ "The curtilage of a dwelling house is a space necessary and convenient, habitually used for family purposes and the carrying on of domestic employment; the yard, garden or field which is near to and used in connection with the dwelling." *Bare* v. *Commonwealth*, 122 Va. 783, 795, 94 S.E. 168, 172 (1917); *accord*, *Patler* v. *Commonwealth*, 211 Va. 448, 451, 177 S.E.2d 618, 620 (1970), *cert. denied*, 407 U.S. 909 (1972). The *Bare* Court noted that "[i]n England the curtilage seems to have included only the buildings within the inner fence or yard, because there, in early times, for defense, the custom was to enclose such place with a substantial wall." 122 Va. at 794, 94 S.E. at 172. The Court further said that "[i]n this country, however, such walls or fences, in many cases, do not exist, so that with us the curtilage includes the

---

[2] Specifically, counsel said: "If this does not fall within the curtilage, I think our argument does fall by the wayside. I think it's got to be an extension of the curtilage or part of the curtilage to fall within the Fourth Amendment. And if we look at *Hester* (that's been cited by the State) that's a 1924 case which doesn't describe or explain or define what an open field is. It's a question whether this property was within an open field or not for the most part."

cluster of buildings constituting the habitation or dwelling place, whether enclosed with an inner fence or not." *Id.*, 94 S.E. at 172.

 Defendant argues he "clearly established" the cornfield as a space which fell within the foregoing definition of "curtilage." He says the cornfield "was close to the Wellford home and surrounding outbuildings." Testimonial evidence and an aerial photograph show that several barns were located at some unspecified distance from the dwelling on the side of the woods nearest the Wellford home. Defendant notes that the cornfield had been used regularly by him for farm production since 1976 and that at the time of the seizure, he had planted approximately 25 acres of corn. He contends it is "significant" that the cornfield as well as the whole property was posted as private property. Thus, he concludes, the cornfield was "obviously and habitually used for domestic employment and family purpose" and "[a]ny warrantless intrusion therein, much less one lasting three days, manifests a total disregard for the reasonable expectations of privacy" which he possessed.[3]

 We disagree. The evidence supports the trial court's finding that the cornfield was beyond the curtilage in an open field. The relative location of the dwelling house, the outbuildings, and the cornfield, as shown by testimony, photographs, and a map not to scale of the area, manifestly demonstrates that the cornfield was remote from the space necessary, convenient, and habitually used for family purposes. The marijuana was growing beyond a patch of woods and was one-quarter mile, or 1,320 feet, from the dwelling. And the evidence of posting and use of the field for farm production is irrelevant to the context of this case.

Accordingly, we conclude that the police intrusion upon the open field in question was not one of those "unreasonable searches" proscribed by the Fourth Amendment.

Therefore, the judgment of conviction will be

*Affirmed.*

---

[3] For a general discussion of the legal authority of police officers to trespass upon private property, without a search warrant or permission of the owner, see *McClannan* v. *Chaplain*, 136 Va. at 10-15, 116 S.E. at 497-99. "[I]n the case of open fields, the general rights of property protected by the common law of trespass have little or no relevance to the applicability of the Fourth Amendment." *Oliver* v. *United States*, 104 S.Ct. at 1735.