## CIRCUIT COURT OF ACCOMACK COUNTY

Commonwealth of Virginia

    v.

Barry Thomas Johnson

June 12, 1996

Case No. 96CR028

BY JUDGE GLEN A. TYLER

In this misdemeanor case the Court, sitting without a jury, is called upon to decide whether incriminating evidence, consisting of striped bass fish brought to shore by the defendant without being tagged as required by law, and certain statements of the defendant regarding those fish, should be excluded from evidence under the exclusionary rule. Specifically, the question is whether there was a search within the meaning of the Fourth Amendment to the United States Constitution, whether the defendant had a reasonable expectation of privacy in the place where and under the circumstances in which the officer observed and seized the fish.

The defendant, Barry Thomas Johnson, is and has been a fisherman or waterman of some thirty years experience in Accomack County. On January 30, 1996, he owned and operated the *Lady Bea*, a boat which he employed in the business of commercial fishing.

The defendant and five other individuals leased property including land and a building and its adjoining wharves located along the navigable, tidal waters of Onancock Creek in the Town of Onancock, Virginia. The defendant and the five other tenants had leased the property for many years, and while they had combined in a joint enterprise to lease the property from its owners, they had neither individual booths nor separately designated areas within the building. All the tenants used the building and surrounding land and wharf even though they operated their individual seafood businesses separately; they were not in business together. Although a majority of the

individuals could make a decision binding among them as to the tenancy of the premises on a given matter, any one could exclude a stranger or third person from the premises. Each individual fisherman kept his separate equipment in the building, docked his boat at the wharf and packed his fish in the building. There was a cooler and an ice room for their use in the building.

The leased premises also include an open roadway or driveway connecting the building and wharf area to a public street in Onancock, so that trucks could come to load fish. The leased property was not open to the public generally in the sense that the public would be invited to the premises, as sales of seafood were at wholesale to buyers who were called when needed.

Each of the tenants had a key and the building was usually secured at night during nonbusiness hours. However, sometimes the building was not closed or locked even though no one was around at night. Furthermore, people unrelated to the seafood businesses of the tenants could come upon the premises with the permission of any tenant.

The leased land is generally bounded on the north and west by the low water mark of Onancock Creek, though the wharves are connected to, and project out from, the building over the intertidal area to the navigable waters of the Creek. The leased property is bounded on the south by the Walker (T & W Block Co.) property, which is for the most part separated from it by a fence along the boundary line. The leased property is bounded on the east by others. The right of way for an entrance to the property runs between the Walker line and the land of others, running in a southern direction to the public street and is also separated from the Walker property by the fence. There was an opening in the fence which would permit passage from the Walker property to the leased property when a chain across the opening was down. Such passage was routinely permitted because of previous arrangements with the owner of the Walker property.

Law enforcement officers of the Virginia Marine Resources Commission (VMRC) had been to the leased premises many times. They went there to post notices, to talk to the fishermen, and to look around or inspect the operations there. They frequently went upon the wharf and could see what was in the boats docked there and could see fish and fish boxes. There was and is a large door on the wharf side (west side) of the building and a large door on the back (south) side. The doors were often open and the officers could see into the building when they were on the premises. Some officers would ask permission to go upon the premises, and some

would not. No specific blanket authority had been given by the tenants to the officers to go upon the premises.

The premises were posted by the display on the building of one small sign that read "Danger Keep Out" and another small sign adjacent to and below the other that was somewhat obscured that read "No Trespassing." The signs were posted on the south side of the building facing the entrance roadway.

On January 30, 1996, the day pertinent to this case, the truck loading door on the south side was closed, but the door on the west at the wharf was open, and some fish had been loaded off of defendant's boat and into the building.

Regarding VMRC officers visiting the premises, several of the tenants testified that the officers were there frequently and they were never refused admittance, though the tenants stated they did not think they could exclude the officers.

The officer who brought the charges in this case, Judy Mackley, stated that she had been to the premises in uniform nine times during the previous year to bring notices to the watermen, to conduct inspections of seafood, and to check the portion of the creek that had been "condemned." Inspections were conducted to determine whether there were any violations of the VMRC laws and regulations. The Captain of VMRC officers on the Eastern Shore testified that he had been to the leased premises during the previous two years occasionally on routine inspections. He had never been challenged by defendant Johnson or any tenant and was always in uniform when he went. Another VMRC officer testified that he had been on the premises dozens of times prior to 1994, many times with another officer. They went there, sometimes weekly, checking the fish as the fishermen brought them in. They went upon the wharves and never felt they had to ask permission. The fishermen were always friendly and never challenged them. They checked Johnson "quite a few" times. They always went in uniform.

On January 30, 1996, VMRC Officer Judy Mackley went unannounced to the leased premises about 10:30 o'clock A.M., and she was in uniform. She went to conduct an inspection of fish to determine if there were any violations. She did not have a search warrant. She drove her VMRC vehicle onto the Walker property and then walked through the opening in the fence to the leased premises, passed the two signs nailed to the building, and went around to the open wharf on the west side of the building.

There, standing on the wharf, she observed approximately thirty un-tagged striped bass lying on the deck of the *Lady Bea*, which she knew to be defendant's boat. The *Lady Bea* was in Onancock Creek and docked or moored to the wharf.

Mackley then turned and looked through the large open door into the building and saw striped bass being weighed on a scale and saw a person, whom she knew to be the mate of the *Lady Bea*, defendant Johnson's mate, dumping striped bass that were untagged from the scale into a box which was three feet from the mate. She walked into the building and the defendant walked up to her. She asked if they were his fish, to which he replied they were. She asked about other boxes close by in the building, and he said they were his also. She opened the boxes and found other untagged striped bass. Approximately seventy striped bass were in the building.

One of the other fishermen who was a tenant was also present in the building at that time.

Officer Mackley issued a summons to the defendant charging him with a violation of VMRC Regulation 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, failure to tag striped bass after bringing to shore. All of the fish were seized. The matter was tried in the General District Court, and defendant takes this appeal, de novo, to this Court.

Defendant filed his motion to suppress, alleging an unlawful search and seizure of the fish. The motion was heard by agreement of the Common-wealth and defendant on the same day as the day set for the trial of the case, May 10, 1996.

After the defendant presented a prima facie case on the motion suffi-cient to go forward, the Commonwealth was required by the Court to present its evidence on the motion to suppress. Then the defendant pre-sented his evidence on the motion. At the conclusion of the evidence on the motion, the Court inquired whether the Commonwealth would be pre-senting any further evidence at trial, and the Commonwealth stated that it had presented its full evidence while on the motion and that would be sufficient for the trial as well. Therefore, the Court concluded that it would consider the entire matter altogether, which was not contested by the Com-monwealth or the defendant. The Commonwealth rested on the merits, and the defendant did not present any further evidence.

At the conclusion of the evidence, the defendant moved to strike and dismiss for failure of the evidence as to venue (Accomack County), which motion was denied by the Court for the reasons stated in the record,

including that the Court would take judicial notice of the fact that the incorporated Town of Onancock was in Accomack County.

The defendant then moved to strike and dismiss for failure of the Commonwealth to present any evidence that the striped bass were taken from tidal waters of Virginia. The defendant offered a copy of the VMRC Regulation 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, and the Court took the matter under advisement along with the principal question presented by the motion to suppress.

The Court will first dispose of the preliminary question in the motion to strike regarding the alleged necessity for the Commonwealth to prove that the striped bass were taken from the tidal waters of Virginia. Defendant mistakenly presumes that a requirement regarding Virginia waters set out in some parts of the Regulation referred to would necessarily apply to all the Regulation pertaining to the taking of striped bass, even though not so stated in the Regulation. For instance, in the Regulation in Part II, General Provisions, Section 2.1, General Prohibitions and Requirements, it is stated in pertinent part that "It shall be unlawful for any person to possess any striped bass taken from the tidal waters of Virginia . . . except in accordance with the provision of Title 28.2 of the Code of Virginia and in accord with the provisions of this regulation." But in the regulation in Part IV, Concerning Commercial Fishing, Section 4.1, General, it is stated in pertinent part clearly that:

> *All* striped bass in the possession of *any* person for the purpose of sale must be identified with a tamper evident sealed tag that has been approved and issued by the appropriate authority in the *jurisdiction of capture*. Whole striped bass shall have tags attached directly to the fish . . . . [emphasis added].

The latter quoted Regulation dealing with commercial fishing does not require that striped bass taken only from Virginia waters be tagged. The preamble to all parts of the Regulation states in pertinent part that "The provisions of this regulation are intended to comply with all Federal and interstate requirements for fishing for striped bass." That some parts of the Regulation deal with striped bass taken from Virginia tidal waters does not mean that all parts are so constrained. Consequently, the defendant's motion to strike for that reason is denied.

The law underlying Officer Mackley's summons is set out in the VMRC Regulation, Section 4.5, Individual Commercial Catch Limits and Tagging, which states in pertinent part:

> *At the place of capture*, and as soon as possible after capture, tags shall be [attached to the fish] . . . . It shall be unlawful to *bring to shore* any commercially caught striped bass that has not been [tagged] . . . . The permittee shall *be on board* the boat or vessel when striped bass are harvested *and tags are applied* [emphasis added].

The defendant had, at the time the officer arrived on the day in question, moored his boat to the wharf and was not on board the boat himself, nor was his mate. No evidence indicated that any other person was aboard the boat. There were striped bass lying on the deck of the boat as shown in a photograph in evidence and according to the personal observation of the officer. Therefore, in the context of the Regulation and the circumstances, the untagged striped bass visible in the boat had been brought to shore, along with those fish which were being scaled by the mate and those in boxes. Furthermore, in such context as previously stated, it was immaterial whether the fish were caught in Virginia waters.

The Court will next digress to review a matter which, while not dispositive of this case, may appear initially to be an appropriate question. That is, the question may arise whether officers of the VMRC had authority to "inspect the catch" in light of general regulation by the government of the harvest of striped bass. While there may be more instances or examples of statutory or regulatory authority for VMRC officers to make inspections, this Court has found only three instances. VMRC officers may inspect aquaculture facilities under the striped bass Regulation, they may inspect crabs for size under the laws regarding blue crabs, and they may inspect oysters under similar laws. There may also be regulations or statutes permitting safety inspections of vessels, but they are not pertinent in this case. Suffice it to say that regarding fishing for striped bass, there is no regulatory scheme under Virginia law or regulations which would allow the so-called administrative searches exception, permitting warrantless inspections or searches of closely-regulated industries. The elements required by law for such an exception are not present here. *Commonwealth v. Burgan*, 19 Va. App. 172 (1994). Officers of the VMRC simply have no general legal authority to go upon private property without a warrant to inspect or make a search regarding striped bass.

The Court will finally address the central question in this case. The defendant filed his motion to suppress evidence of the striped bass and related statements of the defendant, pursuant to Va. Code Ann. § 19.2-60, contending that the officer made a warrantless search and seizure in cir-

cumstances where there was neither a valid exception nor consent of the defendant permitting the search and seizure. For the reasons following the Court finds that the motion should be denied.

This case is to be decided under the Fourth Amendment to the U.S. Constitution which states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

It is also decided according to precedents set by the United States Supreme Court and the appellate courts of the Commonwealth of Virginia, since the Fourth Amendment is made applicable to the States according to familiar principles of law.

The case at bar turns on whether there was a search that was constitutionally unreasonable. To fall within the Amendment's protection, a person must exhibit an actual, subjective expectation of privacy that society is prepared to recognize as reasonable. *Katz v. United States*, 389 U.S. 347 (1967). As stated in *Katz*, the Fourth Amendment applies to people, not to places. See *Commonwealth v. Eley*, 12 Va. App. 744 (1991).

Places accessible to the public, "open fields," and other places in which an individual has no legitimate expectation of privacy that may not necessarily be "fields" as such, do not give rise to the need for a warrant to be searched by agents of the State. *Oliver v. United States*, 466 U.S. 170 (1984). See *Wellford v. Commonwealth*, 227 Va. 297 (1984). As indicated in *Oliver*, the rule applies even where "no trespassing" signs have been erected, since there must be a *legitimate* expectation of privacy. Intrusion into such places by officers is not a search in the constitutional sense just because it may also be a trespass.

While there may be an argument that this case is analogous to one in which an officer intrudes into the curtilage of a private home, that argument would not prevail here. The curtilage rule does not necessarily apply to business premises. *Dow Chemical Co. v. United States*, 476 U.S. 227 (1986). And here the defendant's boat was not within the business premises; it was in a public, navigable stream even though viewed by the officer from the wharf of the defendant.

The defendant's actions exhibit that he did not seek to preserve as private, and that he had no intention to keep to himself, the fact that he had brought to shore untagged fish in violation of the law. He did not seek to exclude the invited eye or the uninvited eye. While it might be argued that there was a trespass by the officer, there was no search of the defendant or his boat. The fish were there on the deck in broad daylight for the officer to see and for anyone else who may have walked up to the wharf or who was traveling along Onancock Creek in any other boat to see. The fish in the boat and the fish in the scale in the building were there for the other tenant, who was not in the fishing business with the defendant, to see. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. *Katz*, 389 U.S. at 351.

The inquiry further includes whether the defendant, by his actions, exhibited an actual, subjective expectation of privacy. *Smith v. Maryland*, 442 U.S. 735 (1979). It was argued that there were no trespassing signs posted, but it is clear from the actions of the defendant and the other tenants that they assigned no importance to the signs and expected them to be ignored routinely. Although the property was private and the business was not retail, other people in substantial numbers went to the property, including VMRC officers on a regular, routine, and frequent basis. They generally met a friendly and receptive response from the fishermen. The fishermen had to know that the officers were subject to showing up any time and for myriad reasons, not just to inspect the catch. Viewed objectively, no reasonable person could conclude that the business premises were exclusively private or that the unloading of fish was a private operation in these circumstances. The assertion at trial that the signs on the building were evidence of a trespass on the day in question is unsupported by actual facts.

The inquiry continues to another level. No one in society would recognize as reasonable one's assertion that he expected to keep private the fact that he brought to shore untagged fish when he left them exposed in a boat which he left unattended and moored in navigable waters which are in reality a public thoroughfare traversed by others. Suppose a person had left untagged fish in the open bed of a pickup truck parked on the street on the other side of this same property. There would be no difference between that and the case at bar as far as expectation of privacy is concerned. Suppose the officer had come up Onancock Creek in her boat, had moored her boat to the bulkhead of the adjoining Walker property, had walked

along the bulkhead to the leased property, had crossed the wharf, gone around the building past the no trespassing signs, down the roadway to the public street, and there saw the untagged fish in a pickup truck owned by the defendant. Would he have any expectation of privacy just because the officer walked across his private, posted property to get to the street?

Once the officer observed the violation of the law in her presence, she then could legitimately look to her right, through the open door and see the fish on the scale. She could then go into the building to investigate an obvious violation and inquire further about ownership of the fish in the boat and about the boxes of fish. Even if one were to conclude that the evidence of the fish in the building should be excluded under the rule, those fish in the boat would be sufficient for the Commonwealth to prevail in its prosecution. Furthermore, it would appear that even the fish in the building are admissible since the untagged fish were in the process of being boxed for removal, which removal the officer reasonably could conclude would have been imminent. In other words, there were exigent circumstances as to those fish in the building. *Payton v. New York*, 445 U.S. 573 (1980).

In the final analysis, the factor of reasonableness is determined from whether government intrusion infringes upon the person and upon societal values protected by the Fourth Amendment. *Oliver*, 466 U.S. at 182. The evidence further discloses no factors to be weighed that would exhibit a subjective expectation on the part of the defendant that the place where the fish were exposed in the boat would be free from governmental invasion. No normal precautions were taken by the defendant to maintain his privacy. That the officers did and would arrive on any given day was an ordinary expectation. There never was an intention on the part of any tenant to exclude any officer, though the testimony discloses that any one of the tenants could have done so. And the defendant revealed the fish to the other tenant there at the time. Were it not for the facts that defendant's boat lay, though moored ashore, in public waters laden with untagged striped bass for all to see, including the other tenant present at the time, this case may have been different.

Counsel for the Commonwealth or the Clerk will prepare an order finding the defendant guilty as charged and assessing a fine of $250.00 and costs.